In re PETTERS COMPANY,
INC., et al., Debtors.

(includes: Petters Group Worldwide,
LLC; PC Funding, LLC; Thousand
Lakes, LLC; SPF Funding, LLC; PL
Ltd., Inc. Edge One LLC; MGC Finance, Inc.; PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.).

Nos. 08–45257, 08–45258(GFK), 08–
45326(GFK), 08–45327(GFK), 08–
45328(GFK), 08–45329(GFK), 08–
45330(GFK), 08–45331(GFK), 08–
45371(GFK), 08–45392(GFK).

United States Bankruptcy Court,
D. Minnesota.

Sept. 30, 2013.

K. Jon Breyer, Adam C. Ballinger, Terrence J. Fleming, Kirstin D. Kanski, Mark D. Larsen, James A. Lodoen, George H. Singer, Sandra S. Smalley–Fleming, Jeffrey D, Smith, Lindquist & Vennum LLP, Minneapolis, MN, Elisebeth Collins Cook, Joseph L. Fogel, Michael J. Kelly, Neal H. Levin, Patrick J. Woytek, Freeborn & Peters LLP, Chicago, IL, Sarah E. Doerr, Issa K. Moe, Moss & Barnett, Minneapolis, MN, Richard B. Drubel, Ethan Frechette, Matthew J. Henken, Kimberly H. Schultz, Boies, Schiller & Flexner LLP, Hanover, NH, Douglas L. Elsass, Adam A. Gillette, Thomas E. Jamison, Lori A. Johnson, Fruth Jamison & Elsass PLLC, Minneapolis, MN, Stacy L. Kabele, Patricia A. Pedersen, Kelley Wolter & Scott PA, Minneapolis, MN, Josiah O. Lamb, Kelley, Wolter & Scott PA, Minneapolis, MN, for Trustee.

Michael R. Fadlovich, Michael E. Ridgway, Robert Raschke, US Trustee Office, Minneapolis, MN, for U.S. Trustee.

Richard B. Drubel, Ethan Frechette, Matthew J. Henken, Kimberly H. Schultz, Ethan Frechette, Matthew J. Henken, Boies, Schiller & Flexner LLP, Hanover, NH, James A. Lodoen, Jeffrey D. Smith, James A. Lodoen, Lindquist & Vennum P.L.L.P, Minneapolis, MN, for Debtor.

## THIRD MEMORANDUM ON "CONSOLIDATED ISSUES" TREATMENT OF MOTIONS FOR DISMISSAL IN TRUSTEE'S LITIGATION FOR AVOIDANCE AND RECOVERY: AVOIDABILITY AND ACTIONABILITY UNDER LAW AND IN EQUITY; ONE LAST ISSUE OF PLEADING.

GREGORY F. KISHEL, Chief Judge.

### PREFACE

This is the third (and last) memorandum of general rulings to be entered, as the

basis for the disposition of pending motions for dismissal in a docket of adversary proceedings in these cases. This litigation was commenced to redress the failure of a massive Ponzi scheme conducted by one Thomas J. Petters—the largest case of investor fraud in Minnesota history and one of the largest in United States history.

The Debtors in these cases were all entities in Tom Petters's enterprise structure. The plaintiff is the Trustee for the Debtors' bankruptcy estates. He commenced the litigation to avoid a large number of pre-petition transfers of funds by the Debtors, and to recover money judgments to effectuate the avoidance. His last complaint was filed on October 10, 2010, one day before the second anniversary of the commencement of the lead case in this group, that of Petters Company, Inc. ("PCI"). At that time, the adversary proceedings totaled over 200 in number.

The majority of the defendants elected to file motions for dismissal in lieu of answers, a right they had under Fed. R.Civ.P. 12(b) and Fed. R. Bankr.P. 7012(b). This resulted in a massive number of contests for adjudication. To cope with that, a "consolidated issues" procedure was adopted by order, to coordinate the presentation of issues that were common to the theories for dismissal raised across the range of the motions made by the defense. The plan was to issue general rulings, where such common issues went to the adequacy of the Trustee's pleading or the ascertainment of the substantive law that would be applied when there was no extant governing precedent.

Further detail about the procedure can be found in the first two memoranda entered on the submission of the "consolidat-

ed issues." *See* Dkt. Nos. 1951 and 2018, reported as *In re Petters Co., Inc.,* 494 B.R. 413, 58 B.C.D. 53 (Bankr.D.Minn. 2013) and 495 B.R. 887 (Bankr.D.Minn. 2013).[1] The earlier memoranda also gave more detail on the origin of these cases and this litigation.

This Third Memorandum sets forth rulings on the balance of the common issues presented via that procedure. Fewer of the issues at bar were formally raised by as many defendants as those in the first two sets. But, all of them are substantial. Two go to the very core of the Trustee's statutory avoidance powers as it is brought to bear toward the greatest potential recovery. A third goes to the sustainability of the Trustee's major alternative theory of recovery, through equitable remedies. All of these rulings will have applicability to defendants who did not formally raise the points treated in their own motions for dismissal.

As before, the issues will be organized by the subject matter of their theory. Formal rulings will be expressly articulated for each issue. The numbering of the discussion and the rulings will be sequential to the first two sets. The same conventions of nomenclature for parties and parts of the record will be used. *See* Amended Second Memorandum [Dkt. No. 2018], 4 n. 3. These are the four issues presented on the third day of oral argument, as previously directed by the procedures order, plus a fifth raised by the structure of oral argument.

Through three of them, the lender-constituency within the defense challenges square-on the Trustee's right to use fraudulent transfer remedies against the sort of

---

**1.** A Second Memorandum was originally issued on July 12 under Dkt. No. 2005. Its text was amended on motion of the Trustee, which was unopposed. The sole effect was to add one word at two points, which the Trustee believed was crucial to the meaning of the particular ruling. Further references will be to the amended version.

transaction they had with the Debtors. For all of those three, the lender-defendants rely heavily on a 2005 decision by the Second Circuit, *In re Sharp Int'l Corp.*, 403 F.3d 43, and several other decisions by circuits other than the Eighth.

## ISSUE # 8:

## ACTIONABILITY AS FRAUDULENT TRANSFER, OF TRANSFER AND PAYMENT ON TRANSACTION DOCUMENTED AS A LOAN.[2]

■ The lender-defendants argue that fraudulent transfer remedies simply cannot lie against the transfers that the Debtors made to them, in repayment on financing that those defendants furnished for the ostensible "diverting" business of the Petters organization. To support this argument, they cite *Sharp Int'l* and they characterize it as on-point authority. The gist of their theory lies in the phrase they use throughout, in the fashion of a litany: "A preference is not a fraudulent conveyance."

*Sharp Int'l* came out of fraudulent-transfer litigation commenced by the trustee in the bankruptcy case of a business that imported, assembled, and distributed real consumer goods.[3] The company had a succession of major operating lenders under lines of credit, plus other debt-investors under subordinated-note arrangements.[4]

This financing, however, funded not only operations but also a massive looting of corporate assets by the company's individual principals. To obtain the inflated amounts of capital needed, the principals falsified internal company records for customer base, sales, and assets. Then they used these documents to induce the lending. This fraud is described as having taken place over a period of two years or more (from "some point prior to 1997, . . . through October 1999"). The creditors thus induced are identified as one major operating lender, State Street Bank and Trust Company—which first lent to the debtor in November, 1996—and a group of subordinated note-lenders—that first loaned in July, 1998 and was then induced by the debtor to advance substantial additional sums in March, 1999 to pay off the majority of the State Street debt.[5]

The trustee in *Sharp Int'l* pleaded that the impetus for the takeout of State Street came from that creditor itself, under the following fact averments. One of State Street's officers "began to suspect fraud [on the part of Sharp International] in the summer of 1998," from several factors: the lack of transparency in the company's accounting procedures; its "fast growth and voracious consumption of cash"; and her own experience as banker with specific cases of borrower fraud that had shown similar characteristics. After several months of investigation and pressing for information from the debtor, the single-

---

**2.** For this memorandum, the order of the 8th and 9th issues is in reverse of the sequence set in the procedures order for the consolidated-issues treatment [Dkt. No. 961]. Thematically and logically, the reversal of this part of the discussion makes more sense.

**3.** Contrasted with the cases at bar, the debtor in *Sharp Int'l* actually did have a real, functioning business that dealt in real goods. It was just that there were not as many goods,

or as much business, as the debtor there represented to its lenders.

**4.** The following summary of pleaded facts is taken from 403 F.3d at 46–48.

**5.** In March, 1999, State Street was taken out of the debtor-company's debt structure completely. The balance of the company's debt to State Street was shifted over to the personal liability of the company's principals, by new guarantees.

transfer takeout of State Street was demanded, arranged, and consummated.

The debtor corporation in *Sharp Int'l* ended up in bankruptcy. Its trustee challenged the payoff of State Street on several grounds, including the theory that it was a constructively- and actually-fraudulent transfer avoidable under the Bankruptcy Code and New York State fraudulent-transfer law:

> The nub of the complaint is that State Street then arranged quietly for the [individual principals] to repay the State Street loan from the proceeds of new loans from unsuspecting lenders, thus avoiding a repeat of the ... losses ... [caused by a similar borrower fraud with which the State Street officer had had direct experience].

403 F.3d at 47.

On State Street's motion, the bankruptcy court dismissed the trustee's complaint in its entirety. As to the fraudulent-transfer count for actual fraud, the bankruptcy court held that the trustee had not pled sufficient facts to support a finding of actual intent to defraud other creditors, on the inferential process that uses the "badges of fraud" approach. The constructive-fraud count was dismissed for failure to anticipatorily plead that State Street had lacked good faith in receiving the payment. 403 F.3d at 48.

On appeal, the district court affirmed on a slightly-variant theory, but otherwise endorsed the bankruptcy court's analysis. 403 F.3d at 48–49.[6]

On appeal, the Second Circuit affirmed the dismissal of the actual-fraud count. It held that the trustee had not pled facts on which to characterize as intentionally fraudulent the *specific* transfer he would have avoided:

> ... the intentional fraudulent conveyance claims fails [sic] for the independent reason that [the trustee] inadequately alleges fraud with respect to the transaction that [the trustee] seeks to avoid, *i.e.,* Sharp's $12.25 million payment to State Street.

403 F.3d at 56. Laying in the centerpiece characterization that the lender-defendants appropriated here, the Second Circuit observed:

> The fraud alleged in the complaint relates to the manner in which Sharp obtained new funding from the Noteholders, not Sharp's subsequent payment of part of the proceeds to State Street. The $12.25 million payment was at most a preference between creditors and did not "hinder, delay, or defraud either present or future creditors."

*Id.*

As the lender-defendants emphasize, this last thought has rooted antecedents:

> Fraudulent conveyance law is basically concerned with *transfers* that "hinder, delay or defraud" creditors; it is not ordinarily concerned with how such debts were created.
>
> . . . .
>
> ... to find an actual intent to defraud creditors when ... an insolvent debtor prefers a less worthy creditor, would tend to *deflect* fraudulent conveyance law from one of its basic functions (to see that an insolvent debtor's limited funds are used to pay *some* worthy creditor), while providing it with a new function (determining *which* creditor is the more worthy).

---

6. The *Sharp Int'l* trustee's third theory of recovery—aiding and abetting a breach of fiduciary duty by the debtor and its principals— was treated at greater length by all three courts. 403 F.3d at 48–53. Those rulings are not relevant here.

*Boston Trading Group, Inc. v. Burnazos,* 835 F.2d 1504, 1510–1511 (1st Cir.1987) (Breyer, J.).[7] *See also B.E.L.T., Inc. v. Wachovia Corp.,* 403 F.3d 474, 477 (7th Cir.2005) (rejecting application of fraudulent-transfer remedies, to payoff of prior lender to over-extended business-borrower, on challenge by other lenders that alleged that their advances funded payoff and furthered operations, "because the best description of what happened here is a preference among creditors. [The debtor] retired the First Union debt while leaving other creditors in the lurch...."; dismissal of later creditors' fraudulent-transfer action warranted even if prior lender knew of debtor's financial instability and over-extension and suspected "that mischief [i.e., fraudulent operations] was afoot....").[8]

In the cases at bar, the Trustee sued a large number of entities and institutions that had lent money to one or more of the Debtors. These defendants engaged in transactions with the Debtors that were documented and treated by the parties as loans of money, made on the lenders' understanding that the proceeds were to be used for the general or transaction-specific support of the "diverting business" in inventory of consumer goods that the Debtors were ostensibly carrying on.[9] The Trustee seeks to recover on account of the repayments made on these prior loans. He would have these transfers of funds characterized in alternate ways: as actually fraudulent on current and future credi-

tors ensnared in the Petters Ponzi scheme, or as constructively fraudulent, i.e., not made for reasonably equivalent value that was actually received by the Debtor-recipients.

The lender-defendants make a blunt, frontal attack on the fundamental availability of fraudulent-transfer remedies to the Trustee here, as against them. However, their reliance on the pronouncements of *Sharp Int'l, B.E.L.T.,* and *Boston Trading Group* is too broad-brush at best, and inapposite at worst. The argument glosses over differences between the two varieties of fraudulent transfers. It inappropriately assigns pivotal significance to the contractual origin of the subject transfers, for the application of fraudulent-transfer remedies against them. And most tellingly, it ignores a crucial difference between the factual matrices pleaded in those three cases and the historical facts pleaded at bar. This difference makes the three decisions fully-distinguishable from the cases at bar.

In all of the three cited opinions, the courts correctly envision the intent that must be proven for the avoidance of an actually-fraudulent transfer, as that harbored by the transferor. They correctly require this intent to have been directed to the transfer that is sought to be avoided. *Sharp Int'l,* 403 F.3d at 56; *B.E.L.T., Inc.,* 403 F.3d at 478; *Boston Trading Group,* 835 F.2d at 1510–1511. Hence, the standards for pleading required that facts be averred to make out such contemporaneous, linked fraud.[10] In all three cases, the

**7.** This decision was issued while its author was a member of the First Circuit Court of Appeals, and before his appointment to the Supreme Court.

**8.** They also cite analogous pronouncements from state courts, including the Minnesota Supreme Court: *Johnson v. O'Brien,* 275 Minn. 28, 31, 144 N.W.2d 720, 721–722 (1966); and, e.g., *Ultramar Energy v. Chase*

*Manhattan Bank, N.A.,* 191 A.D.2d 86, 599 N.Y.S.2d 816 (1993).

**9.** As to the nature of the "diverting" business when conducted in a bona fide fashion, *see* Amended Second Memorandum [Dkt. No. 2018], 21 n. 27, and *In re Polaroid Corp.,* 472 B.R. 22, 36–37 (Bankr.D.Minn.2012).

**10.** Rules 8 and 9, with the gloss of the Supreme Court's decisions in *Bell Atlantic Corp.*

courts addressed motions for dismissal in which the facial adequacy of pleadings was challenged. Hence they looked to the complaints' averments as to this specific sort of transferor intent.

In all three, the courts found that the complaints lacked any averments that, if true, would establish that the specific event of *payoff*—of the defendant-creditors *on their long-preexisting debts*—was motivated or accompanied by any intent to defraud other creditors—even the ones whose cash infusions were alleged to have funded or enabled the payoffs. The factual averments going to fraud went at most to the debtor's inducement to those later lenders, that enabled the payoff; or more generally, they went to the shadiness of the debtors' business operations in surreptitiously piling up debt they could not reasonably repay. *Sharp Int'l*, 403 F.3d at 56–57; *B.E.L.T., Inc.*, 403 F.3d at 478; *Boston Trading Group*, 835 F.2d at 1506–1507.

Hence, the three courts' conclusions that actual fraud had not been pled as to the acts of transfer that had to be found so tainted in order to be avoidable. And hence, the outcome, that avoidance remedies could not be supported on the facts pled. Thus, the lower courts were affirmed in their dismissals of the complaints. And finally, the comments—probably to be classified as dicta—that the transfers were at most preferential, in the understandings of bankruptcy law.[11]

None of the three courts collapsed the transactions toward deeming a common and extended fraudulent intent. One could take exception with the soundness of that, whether it was explicitly rejected (as in *Sharp Int'l*, 403 F.3d at 55) or not; it is reasonably clear from the summarized fact pleading that the plaintiffs in all three cases believed that the pressing, earlier lender could not have been removed absent the gulling of new lenders, and thus the targeted transfer could not have been made absent the victimization of other parties that became new creditors or had their preexisting claims increased.

This made the situation in all three cases not so pure as the simple, classic preference in bankruptcy—where an insolvent debtor disproportionately favors one creditor over others similarly-situated by using *current* resources that are inadequate to satisfy all. The summary pronouncement in dictum may have been a bit too pat on the facts pleaded there. And in any case this suggests that it should not have been brandished here quite so categorically or so vigorously.[12]

More to the point, however, the claims in suit in *Sharp Int'l*, *B.E.L.T.*, and *Boston Trading Group* involved a much more lim-

---

*v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), set the standard for the sufficiency of fact-pleading for a fraudulent transfer action. Amended Second Memorandum [Dkt. No. 2018], 4–9.

**11.** Only one of these three opinions came out of litigation in a bankruptcy case. The other two were generated by "private" fraudulent transfer actions commenced by the frustrated takeout lenders, or perhaps other unpaid creditors, and the transferors were not in bankruptcy.

**12.** In *Boston Trading Group*, the court did recognize the possible availability of avoidance as a preference for the transfer before it, in a hypothetical bankruptcy case in which the transferor would be the debtor. 835 F.2d at 1511. However, the observation was purely academic, because the court was dealing with a fraudulent-transfer action commenced in a United States district court by a receiver for the transferor. And, nowhere in *Boston Trading Group* is there the categorically-exclusive statement that the lender-defendants use here.

ited cast of historical participants, and a much simpler transactional matrix. They were the parties that had effected a single transactional process, the takeout of that one pressing, preexisting creditor from a foundering debtor's debt structure. In the level of complexity and (more crucially) in the nature and breadth of the transferor's motivation to make the transfer, the distinction between that and the situation here is not only material for the focus of the avoidance remedy; it is decisive.

This key difference shunts the rationale and the outcome in those three cases away from the historical facts pleaded here. The complaints at bar allege a massive, multi-year Ponzi scheme that involved many dozens of lender-investors and tens of thousands of transfers on transactions documented and treated as loans. Such an operation would be absolutely dependent on the pervasive exploitation of fraudulent misrepresentation and false pretense, *as to all parties* with which the Debtors transacted. The fraud that is necessary to the sustaining of a Ponzi scheme does not end until the collapse. Its active projection and its consequence only shift from one generation of investor-transferees to another. *See* Kathy Bazoian Phelps and Steven Rhodes, *The Ponzi Book: A Legal Resource for Unraveling Ponzi Schemes* (2012), § 1.02, pp. 1–3 to 1–5.

As a result, where the pleading lies in avoidance litigation brought to redress an alleged Ponzi scheme, the fact averments necessary to make out fraudulent intent are different. Fraudulent intent is properly assumed to pervade the operation of a Ponzi scheme. In litigation to redress its failure, the intent element is adequately pleaded on three basic facts: the existence of the scheme; the funding of the subject transfer by the engine of the scheme (a continuing churning of involved investors and invested money); and the service of the subject transfer in furtherance of the scheme, via the maintenance of a facade of normalcy and success and the satisfaction of previous creditors that otherwise could have forced a collapse.

With that pleading, the intent element is adequately stated and avoidance remedies may lie on an actual-fraud theory. It matters not whether the transferee nominally received its due in payment on a contract that was regular on its face, or even one fully-enforceable under state law. If the contractually-sourced act of making payment on a previous extension of credit is tainted by the purveyor-party's motivation to sustain a Ponzi scheme in which that past credit had played a role, the transferee is not entitled to the deference given by the courts in *Sharp Int'l*, *B.E.L.T.*, and *Boston Trading Group* to a prior lender in a financing history of the much simpler sort pleaded there.[13]

13. Of the three opinions, only *B.E.L.T.* used any wording evocative of the characteristics of a Ponzi scheme; and it was only a reference in passing to how the debtor before it was said to have "prolonged the fraud, borrowing more money until it finally collapsed." 403 F.3d at 478. The verbs for those participles often feature in the description of a Ponzi scheme; but there is no mention in *B.E.L.T.* of fact pleading as to the exploitation of any creditors other than vague "other lenders." 403 F.3d at 476. The duration of relevant events in that case is identified at around two years. And there is no mention of the compli-

cated multi-party turnover of funds that is the hallmark of a Ponzi scheme. *B.E.L.T.*'s author makes a side-reference to "sell[ing] a car at the market price to Charles Ponzi" to make a point in distinction. 403 F.3d at 477. However, this is a stylistic flourish, a sort of exaggeration-to-make-the point: even in the more egregious context of a Ponzi scheme, some transfers of money made by the purveyor may not be subject to later legal challenge in redress of the purveyor's fraud. The text of the opinion itself does not at all support the lender-defendants' characterization of *B.E.L.T.* as a Ponzi scheme case. By contrast, the fraud

The inapposition of the lender-defendants' reliance on *B.E.L.T.* and *Sharp Int'l* is also apparent from reference to other, more relevant case law.

First, the text of *B.E.L.T.* does not even mention significant precedent from that very circuit, *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir.1995). In that opinion, the Seventh Circuit treated fraudulent-transfer remedies as fitting surely and readily to the remediation of a failed Ponzi scheme. The application is given a replete, multi-faceted rationale. The analysis is premised on assigning a different status to unwitting funders of the scheme's operation, after the fact and by judicial declaration. The status is that of creditors of the vehicle-entity. Then they are to be treated as such in working out the consequences of the scheme's collapse. Through the hindsight of equitable principles, this rebranding is imposed even where the participation was facially structured as equity investment under documentation and through transaction.

*B.E.L.T.*'s rejection of fraudulent-transfer status for the situation it treated has nothing to do with the different and more complex situation treated in *Scholes v. Lehmann*. B.E.L.T.'s ruling did not even require a reference to *Scholes*, let alone an express distinguishing. The situations treated were so different as to permit both analyses to coexist. And in the end, *Scholes*'s assignment of hypothetical creditor status gives its rationale a platform common with B.E.L.T., at the lowest level, on their classification-related predicates.[14]

This outcome is consistent with an on-point holding on a somewhat different articulation, from an appellate-level court within the Second Circuit, the circuit that issued *Sharp Int'l*. In *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1 (S.D.N.Y.2007), the court held that *Sharp* does not vitiate the application of fraudulent transfer remedies to a bankruptcy case commenced to remediate a failed Ponzi scheme. It analyzed *Sharp Int'l* at length, and distinguished it from the Ponzi scheme-spawned litigation before it. This was done on both fact-pleading and law. 397 B.R. at 9–11.

The *Manhattan Inv. Fund* court noted that various circuits had adopted the Ponzi scheme presumption before *Sharp Int'l*, as had the federal trial courts within the Southern District of New York. 397 B.R. at 10. It emphasized that *Sharp Int'l* did not involve a failed Ponzi scheme, so the *Sharp Int'l* court had not been required to address the presumption of intent applicable to Ponzi-scheme cases. *Id.* Most crucially, "the transaction at issue in *Sharp* was different from the typical transaction in a Ponzi scheme." 397 B.R. at 11. The creation of the underlying debt in *Sharp Int'l* predated the pleaded commencement of fraudulent activity by the debtor there. This specific circumstance had been cited by the Second Circuit for its holding in *Sharp* that there was "no ground ... to 'collapse' that loan with other (non-contemporaneous) bad-faith maneuvers" by the debtor, because the transactional structure that resulted in the challenged payment was "unrelated to" the pleaded acts of

---

that would have been requisite to actionability in *Sharp Int'l*, *B.E.L.T.*, and *Boston Trading Group* was necessarily more limited in scope and victim(s). Although significant in value, the harm was limited to a smaller number of mulcted lenders that saw themselves as the goats for the prior creditor paid off and taken out. And in each case only one party re-

ceived the benefit of the debtor-transferor's more circumscribed machinations.

14. Definitionally, the Bankruptcy Code conceives of creditors as having pre-petition claims against the debtor, 11 U.S.C. § 101(10)(A); and claims are conceived of as "right[s] to payment," whether legal or equitable, 11 U.S.C. § 101(15)(A).

fraud. *Id.* (quoting *Sharp Int'l,* 403 F.3d at 55). Thus, as the *Manhattan Inv. Fund* court held, "*Sharp* does not dispose of the Ponzi scheme presumption" of fraudulent intent, in the sense of making it inapplicable to the avoidance of transfers made through loan-format transactions; "[a]t most, it simply means that courts must be sure that the transfers sought to be avoided are related to the scheme." *Id.*

That latter characteristic, relatedness, is best equated to the concept of being "in furtherance of" the Ponzi scheme, in the parlance of the presumption—a matter mostly of fact but with some legal dimension.[15] Here, the Trustee has pleaded that payments made to lender-defendants were done in furtherance of a Ponzi scheme, and the operational aspects of the scheme were pleaded at length; so, complaints seeking avoidance of such payments are not subject to dismissal as a matter of law. Since the Ponzi scheme presumption applies to this litigation, *see* Amended Second Memorandum [Dkt. No. 2018], 25–26, the averment of such a connection is sufficient to plead a basis for avoidance as an actually-fraudulent transfer under either Minn. Stat. § 513.44(a)(1) or 11 U.S.C. § 548(a)(1).

The lender-defendants also relied on *Sharp Int'l* for their motion to dismiss the constructive-fraud counts of the Trustee's complaints. The opinion in *Sharp Int'l* does use some of the previously-described notional structure to treat the counts on constructive fraud before it. The lender-defendants seem to rely on this part of *Sharp Int'l* toward the general shelter from avoidance that they seek for repayments on loans. The same rationale that was applied to the actual-fraud alternative applies equally here, however, and the constructive-fraud counts are not to be dismissed on this rationale.[16]

Thus, *Ruling # 8:* The Trustee is not barred from invoking fraudulent-transfer remedies as to transfers of money made by the Debtors, in repayment to those defendants that had previously lent money to the same Debtors, merely because the payments were made on transactions documented as loans and treated as such by the parties thereto. As long as the Trustee adequately pleads that the transfers in loan repayment were made in furtherance of a Ponzi scheme, they are actionable as actually- or constructively-fraudulent.

## ISSUE # 9: AVOIDABILITY AS CONSTRUCTIVELY–FRAUDULENT TRANSFER, OF PAYMENT MADE ON ANTECEDENT DEBT OF DEBTOR.

■ Before the hearings, the next issue was queued up in deceptively-simple wording: "Whether the Trustee has sufficiently pleaded that transfers on purported antecedent debt were made for less than reasonably equivalent value, where the

---

15. *See* Amended Second Memorandum [Dkt. No. 2018], 26–27; *In re Polaroid Corp.,* 472 B.R. at 35–36.

16. *Sharp Int'l* does treat its constructive-fraud counts more directly under a different rubric, the whole question of value received in exchange for the payment, or not. 403 F.3d at 53–56. (The lack of a balancing value received by the debtor-transferor is an essential element of any case-in-chief for avoidance under a constructive-fraud theory.) *Sharp Int'l* applied the New York statute's wording "without fair consideration" as used in the Uniform Fraudulent Conveyance Act, rather than "for less than reasonably equivalent value" as used in both the federal and Minnesota statutes. There may be a qualitative conceptual difference between the two forms of language. However, the thought is cognate enough for present purposes. *See* Phelps and Rhodes, *supra* p. 10, at § 3.01[3], at 3–3 n. 2. This point of fact is germane to the next matter in the order of consolidated-issues business; it is not relevant to this one.

complaint alleges that the transfers satisfied the debt."[17]

As it emerged through later briefing and argument, the issue was not one of pleading. It was whether the Trustee even had a right to recover under the theory of a constructively-fraudulent transfer for which a Debtor had not received a reasonably equivalent value, in consequence of payments that Debtor had made to a lender-defendant—and as to any component thereof, principal and interest alike.

The question thus was whether the Trustee could even make out a prima facie case against a lender-defendant under governing law, given the uncontested predicate of a payment's linkage to a Debtor's repayment under an earlier contractual extension of credit. The substantive dimension of the issue then spilled over to the Trustee's claims of actually-fraudulent transfer, though it was material there at the secondary stage of an affirmative defense.

This line of argument was an attempted hammer-blow at a whole theory of recovery for the bankruptcy estates, and potentially to all recovery under fraudulent-transfer theories against a major constituency of the defense. That made it serious. After that, the issue got more complicated, and more confusing, when both the lender-defendants and the Trustee hardened into absolutized, all-or-nothing positions as to avoidability.

Both sides pushed the ante to the top. As it turns out, the best legal authority on these issues requires the blanket to be divided. And in consequence, the issues narrow markedly for the litigation going forward.

For the treatment of this issue, the origin lies in definitional provisions in the federal and Minnesota fraudulent transfer statutes:

> ... "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, ...

11 U.S.C. § 548(d)(2)(A); and,

> [v]alue is given for a transfer ... if, in exchange for the transfer ... an antecedent debt is secured or satisfied ...

Minn.Stat. § 513.43(a).

These provisions assign the character of "value" to the legal result of any payment made by a debtor-transferor to its creditor, i.e., the satisfaction or securing of a preexisting debt. They apply anywhere the concept of "value" is legally relevant in a fraudulent-transfer action.[18] Here, the lender-defendants claim the benefit of this characterization for all monies they received from a Debtor on any debt owed to them before the making of the payment. They demand dismissal of the Trustee's constructive-fraud claims against them, to the extent he seeks to avoid any such payments on preexisting debt.

This issue is conceptually intertwined with Issue # 7, treated in the Amended Second Memorandum [Dkt. No. 2018], 38–45. There, the lender-borrower relationship was examined toward gauging the adequacy of the Trustee's *pleading* of a

---

17. The wording was finalized by the court in the procedures order, but it was formulated with prior input from the parties. When the issue was presented later for decision, the Trustee's counsel insisted that his client had never conceded that any "debt" was "satisfied" by any lender-defendant's payment. This dithering could have introduced yet another complication; but in the end the notion of a *full* "satisfaction" is irrelevant.

18. The Bankruptcy Code's definition is prefaced by the words "[i]n this section—," i.e., all of § 548. The Minnesota statute's provision is right in the middle of MUFTA. It is a simple declaration that logically applies to the whole statute and nothing else.

constructively-fraudulent transfer. Here, the lender-defendants advance similar considerations; but they cite them to support a frontal challenge to the Trustee's right under law to recover anything against them.

At the stage of the Trustee's prima facie case, that challenge succeeds only in part—i.e., as to one component of the subject transfers. On the very same authority, the outcome is opposite as to the other component; the Trustee gets the advantage of a decisive classification as a matter of law for his prima facie case. Further, the treatment for the statutory affirmative defense is firmly structured under the very same considerations.[19]

The elements of the lender-defendants' argument are summarized at p. 42 and n. 45 of the Amended Second Memorandum [Dkt. No. 2018]:

> First, the payment [the lender-defendants] received in both principal and interest was no more than their contractual due on a preexisting debt.

> Second, the partial or full satisfaction of the debt was statutorily-recognized "value" received by the particular Debtor, to the extent of the amount paid.

> Third, because the payment reduced or abated the debt dollar-for-dollar, the reasonable equivalence is undeniable.

Thus, the lender-defendants argue, the Trustee cannot argue or prove that the particular Debtor received less than a reasonably equivalent value in exchange for the payment it made, 11 U.S.C. § 548(a)(1)(B)(I) and Minn.Stat. § 513.44(a)(2). They seek to bar him as a matter of law from avoiding any of the payments to them as constructively-fraudulent transfers.

There is case law to buttress this argument, at least as to the principal component of the payments made. However, that is all the further it can go, under the weight of authority.

The bellwether opinion is *Scholes v. Lehmann*, cited *supra* at p. 352 and one of the earlier circuit-level decisions (1995) in the recent evolution of fraudulent transfer law as it applies to a failed Ponzi scheme.[20] *Scholes v. Lehmann* treats a half-dozen major issues, not all of them relevant here.[21] The pertinent parts of the opinion, however, establish an analytic framework for determining the avoidability on constructive-fraud theories, of payments made by the purveyor to defendants that had infused money into the scheme under the documentary form of investment, and had received substantial payment back ostensibly on account of their investment.

---

**19.** Yes, it was suggested that a dispositive treatment of value and reasonable equivalence was premature at this point in the litigation, in remarks made for the treatment of Issue # 7 in the Amended Second Memorandum [Dkt. No. 2018], 41–45 and n. 47. On a deeper analysis, and with better substantive focus on extant case law, it became clear that the issue could be reached now.

**20.** Some of the components of *Scholes*'s sequential analysis featured first in *In re Independent Clearing House Co.*, 77 B.R. 843 (D.Utah 1987), in the construction given to parts of the constructive-fraud provisions of 11 U.S.C. § 548(a) for application to a failed Ponzi scheme. The overall conceptualization of parties, their status as conceived in equity, and their resultant rights and liabilities is original to *Scholes*.

**21.** Among those not relevant are the standing and empowerment of a court-appointed receiver to invoke fraudulent transfer remedies on the ground of the fraud of the person and entities in receivership; the availability of the *in pari delicto* defense; the avoidability of an individual purveyor's charitable donations and his payment of support obligations to an ex-spouse from monies traceable to the Ponzi scheme's operation; and evidentiary matters.

The analysis is piercing.[22] It goes beyond the papered top-layer of nominal relationships between scheme-vehicle and investor-infuser, to the corrupt imposthume of a Ponzi scheme as it actually lies and is operated. It legally recategorizes the nature of relationships and the status of participants throughout such a scheme, to an understanding that matches the reality. This then enables the sorting-out of consequences toward a greater equity and a more salubrious outcome, than just leaving a collapsed scheme in place with big end-losers and fully-escaped net-winners.[23]

That greater equity is deemed to lie in favor of unsatisfied creditors and investors. 56 F.3d at 757. The equities are given effect on an underlying reality: the returns paid to prior, satisfied and exited investors were funded not from legitimate business transactions into which they were ostensibly investing, but from the perpetration of further fraud on later investors. *Id.*

Yet the other side of equity's balance is honored as well. *All* defrauded infusers of capital, past-out and still-hooked alike, are deemed to have or to have had the legal status of "tort creditors," i.e., potential claimants against the perpetrator or the vehicle-entity on a fraud-in-the-inducement theory. 56 F.3d at 754–755. As such, they would be entitled to receive the principal amount of their original infusion back, by way of rescission and restitution; or they are deemed to have been so entitled prior to their satisfaction, in the same status.[24] *Id.* As *Scholes v. Lehmann* articulates it, the deemed surrender of this right of recovery equates to a "fair exchange" of consideration for that component of the challenged transfer, in the vocabulary of the pre-UFTA Illinois law applied there, or "reasonably equivalent value" under § 548(a) (or statutes like MUFTA). 56 F.3d at 756. As a result, the past repayment of paid-in equity investment is not avoidable as constructively-fraudulent under statute. *Id.*

The "profit" component of such a payment, however it is denominated contractually, is recoverable in avoidance. The principle is that its ostensible accrual and later payment to the investor was not "offset by an equivalent benefit" received by the vehicle-entity of the scheme, in the sense of being linkable to the sustaining of a legitimate, viable business that was profitable in reality, or to a reinvestment by the recipient-investor that would have in-

---

**22.** Judge Richard Posner, then Chief of the Seventh Circuit, is the author of *Scholes v. Lehmann.*

**23.** This is pretty much the way the Petters-related cases would be left, were the lender-defendants' arguments adopted in their entirety. In oral argument, counsel blithely exhorted the court to dismiss all fraudulent-transfer claims against the lender-defendants, and "leave the Trustee with his preference actions." The record throughout these cases suggests that the tightening of the financial markets in late 2007 left Tom Petters with dwindling sources of capital. And, apparently, the same systemic contraction left lenders that entered the Petters operation in 2006–2007 locked in. Thus, most likely, there is relatively little for the Trustee to recover in

avoidance of preferential transfers in comparison to the end-shortfall at the scheme's collapse, given the maximum one-year reach-back under 11 U.S.C. § 547(b)(4).

**24.** From a real-world perspective, there is no reasonable way to deny the attribution. For instance, there is little doubt that all of the lender-defendants here would have gone to law and sued Tom Petters and the Debtors for the very same relief, had they not been paid off and had they gained an inkling of the true state of affairs. A number of such actions were pending when the receivership over Tom Petters and his assets was established in the district court. Attempts by those creditor-plaintiffs to return to their original forums of suit were rejected, in favor of the central, global forums of receivership and bankruptcy.

creased the net worth of a bona fide, operating vehicle-entity. 56 F.3d at 757. Rather, given the inherent insolvency of a Ponzi scheme, "[t]he paying out of profits to the [recipient-defendant] not offset by further investments by him conferred no benefit on the [vehicle-entities] but merely depleted their resources faster." *Id.*

As a result, the payment of "profit" (or interest) is not insulated from avoidance by the considerations applicable to a return of principal. More broadly, in the greater goals of equity the paid and exited earlier investor should not be allowed to benefit from an ongoing fraud to the detriment of remaining and unsatisfied later investors, merely because the earlier investor was not itself to blame for the fraud. The earlier investor need return only "the net profits of [its] investment—the difference between what [it] put in at the beginning and what [it] had at the end." 56 F.3d at 757–758.

The analysis in *Scholes v. Lehmann* is communicated in a condensed style. The text itself resonates more with abstract concepts than with specific statutory language. However, it is very much of a whole and it is structured throughout by a notion of balance. The elements of the analysis very much dovetail with the statutory vocabulary of § 548(a)(1)(B) and MUFTA.

And, there is no compelling reason to distinguish its analysis from a case where participants in a Ponzi scheme's operation did so through infusions documented as lending under fixed terms, rather than investment whether through equity participation in a vehicle-entity or through the ostensible management of placement into third-party forms with a segregation of principal for the investor.[25] Under the same considerations, the thing received by the debtor-transferor is equally illusory, whether it is associated with payment attributable to a fictitious profit (in the case of an investment-denominated infusion) or interest at a contractual rate (in the case of a loan-denominated infusion).

For the analysis of value and reasonable equivalence, the relevant consideration here is the *benefit* received by the vehicle-entity in exchange for the payment out to those who infused money earlier. The return of capital or investment improves the balance sheet of the vehicle-entity by reducing debits to net worth. But, as to profit or interest paid out from other parties' infusions, nothing is identifiable to real generation of income from past infusions, and nothing is retained or received. It has been siphoned, on an ongoing basis, toward the satisfaction of earlier infusers of money and away from the purposes represented to later infusers.

In reality, the only consequence of the payment and receipt is the prolongation of a fraudulent shell, and the piling-up of further harm to future investor-infusers. And these are the central considerations for the *Scholes* analysis, regardless of how the facade for the scheme was legally-structured and documented. *Cf. Perkins v. Haines*, 661 F.3d 623, 628 (11th Cir. 2011) (". . . no court has distinguished between equity investments and debt-based claims when applying the general rule to fraudulent transfer actions arising out of a Ponzi scheme").[26]

---

**25.** The latter as in the Madoff scheme—or, for that matter, in the original scheme purveyed by Charles Ponzi almost a century ago.

**26.** The court in *Perkins v. Haines* was addressing a posture of claims and defenses different from the one here. There, a suing trustee was seeking to entirely bar defendants who had been equity investors from invoking the statutory notion of "value" for their infusions and the repayments to them, for their defense against the trustee's case in chief. The trus-

So, under the statutes to be applied here, there is no value to be attributed to the payment of anything beyond return of principal to a lender-defendant. The status of lender-creditor, held under a fraudulently-induced contract, is overridden in equity by the status of tort creditor; and the only debt cognizable from such a status is an entitlement to restitution of the principal. Nor, really, could there be reasonable equivalence for the full amount of the transfer, regardless of a contractual entitlement to interest that would otherwise equate to a debt owing in the understanding of the statutes. No legitimate benefit is to be assigned to the vehicle-entity from the siphoning toward such purposes. The value of the payment-out of ostensible interest has no corresponding input received by the vehicle-debtor.

The analysis of *Scholes v. Lehmann* has been adopted in subsequent circuit-level opinions. *E.g., In re Hedged–Inv. Assoc., Inc.,* 84 F.3d 1286, 1290 (10th Cir.1996); *M & L Business Mach. Co., Inc.,* 84 F.3d 1330, 1340–1342 (10th Cir.1996); *Donell v. Kowell,* 533 F.3d 762, 770 (9th Cir.2008); and *Perkins v. Haines,* cited earlier. *See also In re Bernard L. Madoff Inv. Secs. LLC,* 454 B.R. 317, 333–334 (Bankr. S.D.N.Y.2011) (collecting cases). *Perkins v. Haines* most succinctly summarizes the structure of avoidability under this line of authority:

> In the case of Ponzi schemes, the general rule is that a defrauded investor gives

"value" to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal.... Courts have recognized that defrauded investors have a claim for fraud against the debtor arising as of the time of the initial investment.... Thus, any transfer up to the amount of the principal investment satisfies the investors' fraud claim (an antecedent debt) and is made for "value" in the form of the investor's surrender of his or her tort claim. Such payments are not subject to recovery by the debtor's trustee.

661 F.3d at 627.

Since *Scholes,* the division of challenged transfers into components equating to principal and profit (or interest) and its respective assignment of avoidability to each has become a virtual rule of thumb to begin an application of fraudulent-transfer remedies, in this context. The "prevailing view" carries forward *Scholes's* first postulate, that value is received by the debtor on repayment of principal, because "the debtor, and therefore the [later-arising bankruptcy] estate of the debtor is neither richer nor poorer for having returned the principal investment, since the payment thereby reduced the Ponzi debtor's [deemed] restitution liability...." *See* Phelps and Rhodes, *supra* at p. 10, § 3.02[3][a], at p. 3–12. There does not seem to be any controversy in the case law

---

tee's argument was rejected with the quoted pronouncement. This was done on the observation that the Ninth Circuit, the only one to treat this argument to that point, had "rejected any attempts to distinguish between the forms of the investment" on an application of the *Scholes* analysis. *Id.* (citing *In re AFI Holding, Inc.,* 525 F.3d 700, 708–709 (9th Cir.2008)). One is tempted to say that the obverse application should be allowed here, on the principle of "sauce for the goose" and nothing else. But there is a better reason for

not excepting lending-case infusions from the application of *Scholes:* it would elevate form over substance to inequitable effect, when there is no defensible distinction to be drawn on the undeniable equitable considerations that so strongly structured the rationale in *Scholes.* There is also no distinction as to the expectancy of repayment between an outright lender and an account-based or transaction-based "investor" with a contractual right to return of principal.

over the reasonable equivalence of the amount repaid on principal to the benefit to be deemed to the debtor, dollar-for-dollar. *Id.*[27] *See, in particular, In re Independent Clearing House Co.,* 77 B.R. at 857. And though a few courts have held that payments to investors above the return of principal do constitute reasonably equivalent value, *e.g., In re Churchill Mtg. Inv. Corp.,* 256 B.R. 664, 680 (Bankr. S.D.N.Y.2000), *aff'd, Balaber–Strauss v. Lawrence,* 264 B.R. 303 (S.D.N.Y.2001), their rulings require an inappropriately-blindered focus on the proprieties of the specific transaction. The holistic approach of *Scholes,* its predecessors, and its progeny is the appropriate one. *See* Phelps and Rhodes, *supra* at p. 10, § 3.02[1]-[3], at pp. 3–2 to 3–19.

Thus, as to the Trustee's pleaded case for avoidance on grounds of constructively-fraudulent transfer, ***Ruling #9:*** The Trustee cannot exercise the power of avoidance under the constructive-fraud theories of applicable statute as to any Debtor's repayment to any defendant of principal on a loan or other extension of credit previously made by that defendant to the Debtor, because that repayment gave reasonably equivalent value to the Debtor via the satisfaction of a preexisting debt on a claim for restitution. However, on behalf of the appropriate bankruptcy estate, the Trustee may avoid, as a constructively-fraudulent transfer within the scope of 11 U.S.C. § 548(a)(1)(B) and Minn.Stat. §§ 513.44(a)(2) and 513.45(a), that portion of any payment to any such defendant that was in excess of the amount

of principal paid, whether denominated as profit, interest, or otherwise, because the paying Debtor did not receive a reasonably equivalent value from the defendant in exchange for the payment.

## ISSUE # 10: AVAILABILITY OF AFFIRMATIVE DEFENSE TO AVOIDANCE OF ACTUALLY–FRAUDULENT TRANSFER, ON ACCOUNT OF PAYMENT RECEIVED ON ANTECEDENT DEBT.

■ The analysis of *Scholes v. Lehmann* applies directly to claims of constructive-fraudulent transfer. However, it is only there that the concept of value bears on the avoidability of the transfer in the first instance. A transfer impugned as actually fraudulent (here, under 11 U.S.C. § 548(a)(1)(A) or Minn.Stat. § 513.44(a)(1)) may be subjected to avoidance without considering any exchange of value between the Debtor-transferor and the recipient. As a matter of a plaintiff's case in chief, a transfer is avoidable upon proof of the specified intent on the transferor's part and no more need be proven.

From that limited perspective, it would seem that the actual-fraud theory is the far more powerful of the two—even considering the general difficulties of proof for subjective intent as an element.[28] However, the lender-defendants invoke a value-oriented affirmative defense, the one under 11 U.S.C. § 548(c) and Minn.Stat. § 513.48(a), which applies to both varieties

---

**27.** Phelps and Rhodes do identify a difference in the case law, as to whether only the raw amount of original principal investment alone is to be deemed as reasonably equivalent, or whether the investor should get additional credit against avoidance on a consideration of the time value of money. *See* Phelps and Rhodes, *supra* at p. 10, § 3.02[3][f], at pp. 3–

18 to 3–19. This issue is not presented by the parties here.

**28.** These difficulties have been recognized in the context of fraudulent-transfer litigation in the case law; *inter alia, In re Armstrong,* 141 F.3d 799, 802 (8th Cir.1998).

of fraudulent-transfer claim.[29] On this defense, they insist that their receipt of payment from any Debtor is immune to avoidance as an actually-fraudulent transfer, even if the Ponzi scheme presumption gives the Trustee a ready way to satisfy the sole element of a specific intent.[30]

With that in mind, the lender-defendants challenge the sufficiency of the Trustee's complaints. They argue that he has not stated enough facts to make out a lack of good faith on their part in accepting the payments. (As a preliminary for the defense, they proffered the classification of the payments as satisfaction of a debt for principal and interest owing under contract, as indisputably meeting the element of "takes for value." This was put forth quite perfunctorily—in fact, it was close to a matter of assumption.)

When first advanced, this argument led to a point-counterpoint over whether the Trustee was required to plead a detailed basis for a lack of good faith on the part of the lender-defendants, in anticipation that his opponents might raise the defense but before any lender-defendant had responded to his fraudulent-transfer claims in any way. The Trustee insisted that he had no

such initial duty and there is much to be said for that. The surface rectitude of his position was reinforced by the procedural posture of most of the lender-defendants: they had not even bothered to responsively plead and instead had rushed into motions for dismissal toward terminating the litigation early in any way possible.[31]

The sides then took "I win, I take all" approaches to the matter of value under statute. This antagonism obscured the place of this distinct issue in an effective consolidated-issues procedure. When the true implications of adopting *Scholes*'s analysis are realized, however, this issue is put right out front. And the affirmative defense can be addressed at this stage on the grounds of substance; the adequacy of pleading has only secondary significance. The resulting disposition of the good-faith issue will have real effect in channeling this litigation.

Given the rulings on Issue # 9, the following points should be obvious. The affirmative defense of value received in good faith might shelter the lender-defendants against the Trustee's actual-fraud claims to a like extent as his constructive-fraud

---

**29.** The relevant text of these statutes is:
> ... a transferee ... of such a transfer ... that takes for value and in good faith ... may retain any interest transferred ..., to the extent that such transferee ... gave value to the debtor in exchange for such transfer....

11 U.S.C. § 548(c) (the prefatory exception, "... to the extent that a transfer ... voidable under 11 U.S.C. § 548(a) is voidable under [11 U.S.C. §§ ] 544, 545, or 547," is irrelevant to the issue at bar), and
> [a] transfer ... is not voidable under [Minn.Stat. § ] 513.44(a)(1) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee....

**30.** *See* Amended Second Memorandum [Dkt. No. 2018], 24–33 for discussion on the presumption and the use of it for this litigation.

**31.** But then there was the Trustee's substantive argument, that only "innocent" lender-recipients should be allowed to retain a portion of payments received, with the insinuation that lender-defendants had lacked good faith in taking payment when the terms of the underlying deal had been so far from prevailing market norms that the lenders' mere participation evidenced their complicity with the Petters scheme. The Trustee premised this thrust on citations to prominent authority, *e.g., Donell v. Kowell,* 533 F.3d at 772; and *In re Bernard L. Madoff Inv. Secs., LLC,* 440 B.R. 243, 262–263 (Bankr.S.D.N.Y.2010) and other cases cited therein. This gambit not only contained an inflamed hornet's nest; it tipped it right over. Luckily, it need not be addressed now.

theories are sheltered. The payment of principal constitutes "value" for the purposes of 11 U.S.C. § 548(c) and Minn.Stat. § 513.48(c), in the very same way as it does for § 548(a)(1)(B)(i) and Minn.Stat. § 513.44(2). But under *Scholes*'s rationale, the payment of interest or profit lacks all value for the purposes of § 548(c) and Minn.Stat. § 513.48(c), just as it does on the merits of a plaintiff's case in chief.

If a defendant in a fraudulent transfer action cannot prove both elements of this affirmative defense, it cannot have its shelter. *See e.g., Taylor v. Sturgell,* 553 U.S. 880, 907, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008) (explaining the "traditional allocation of the proof burden" for an affirmative defense is to the party asserting them). *See also Smith v. Sac Cnty.,* 11 Wall. 139, 78 U.S. 139, 147, 20 L.Ed. 102 (1870) (recognizing the principle by which a defendant is bound to prove all the facts necessary to constitute a defense). Clearly, under *Scholes*'s analysis, the receipt of interest in this specific context does not qualify as value received by a debtor. The lender-defendants cannot assert that any Debtor-transferor received value from paying the interest they received in transfers that were in furtherance of the Petters Ponzi scheme.

The defense, then, would fail as a matter of law as to this component of payments received, for want of the ability to establish one of its essential elements. *Cf., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (summary judgment on claim or defense is properly granted to opponent of claim or defense, where record as a whole, including all extant fruits of investigation and discovery, shows complete lack of evidence to support an essential element, and re-spondent-proponent of claim or defense

fails to produce evidence to support finding to satisfy such element). Without question, the Trustee could recover the interest component of such a transfer on his case in chief, in avoidance under an actual-fraud theory, upon proof of the requisite intent.

The receipt of repaid principal, however, would constitute value for the purposes of the affirmative defense.[32] So, if a lender-defendant can meet its own burden of proof on the other element, receipt in good faith, the Trustee may not recover the principal component of payments made, even under an actual-fraud theory.

This doubles the discussion back around to the lender-defendants' attack on the content of the Trustee's pleading, the orientation originally framed for this issue. The argument seems to stem from two different premises, one more enveloping than the other.

The broader point is an insinuation that the Trustee's own fact averments in his complaints, if taken as true, set forth a full basis on which good faith could be found in the lender-defendants' favor. Were this so, the Trustee would have largely routed himself on the affirmative defense, however inadvertently, and his complaints would fail on their own content.

The lender-defendants' relied on *Wycoff v. Menke,* 773 F.2d 983 (8th Cir.1985), for this thrust. The cited authority, however, is inapposite. In that case, the affirmative defense in question was the statute of limitations. Without the pleading of circumstances on which to invoke tolling, a discovery allowance, or the like, the complaint's citation of a single date for the event that constituted the cause of action in suit did indeed enable a time-barring

**32.** And because the receipt of "value" alone is the first element of the defense, the element is

satisfied. The matter of reasonable equivalence is irrelevant.

analysis to conclusive result; no extrinsic material had to be consulted or used.

*Wycoff*, however, involved a defense much less fact-intensive in its core operation. Here, the lender-defendants seem to be saying that good faith just screams out from the Trustee's threshold recitations: the lender-defendants loaned money to the Debtors; the Debtors paid it back per terms—and thus how could that possibly *not* be in good faith?

The detailed backdrop allegations take care of that pat construction of the pleadings: all of this was done in the Debtors' furtherance of a Ponzi scheme. The lender-defendants would cast the Trustee as loading a weapon against himself; but the attempt fails, just like that.

Their other spin is that the Trustee had an affirmative burden to plead far more facts on their lack of good faith than he did, to anticipate their raising of the defense; and hence he should either be subjected to dismissal or ordered to replead in detail.

 The potential defense here is far more fact-specific than the one in *Wycoff v. Menke*. That puts much more significance on the stage in litigation at which the lender-defendants raise their point. In the specific context of a fraudulent transfer action, it has been held locally that facts going to a defendant's potential good faith defense have no relevancy at the stage of a motion for dismissal brought on the ground that the plaintiff has not pleaded a prima facie basis for its claim, and hence the state of pleading as to such facts is irrelevant then. *S.E.C. v. Brown*, 643 F.Supp.2d 1077, 1078 (D.Minn.2009); *United States v. Bame*, 778 F.Supp.2d 988, 993 (D.Minn.2011). There is authority to the contrary from other jurisdictions[33];

but the rule applied by our district court is the rule to apply here. *See also In re Bernard L. Madoff Inv. Secs., LLC*, 454 B.R. 317, 331 (Bankr.S.D.N.Y.2011); *In re Dreier LLP*, 453 B.R. 499, 510 n. 6 and 511 (Bankr.S.D.N.Y.2011).

It nonetheless is appropriate to make a short reference to the factual content of the Trustee's complaints that was expressly directed toward the issue of defendant-transferees' good faith. For his pleading against most of the lender-defendants, the Trustee cites the Debtors' consent to interest rates alleged to have been abnormally high, as a basis on which to deem the lender-defendants on inquiry notice of something very wrong behind the Debtors' facade. He proposes this circumstance, and sometimes others, as the basis for an ultimate finding, lack of good faith on their part in taking payment.

The thought behind this position is somewhat attenuated; such averments certainly do not shout for a finding of complicity in the Petters scheme. In isolation, the implications of such circumstance may not be enough to defeat a case for the affirmative defense. However, for pleading purposes it was not the Trustee's burden to recite more by way of circumstances, greater in number or more anomalous, in anticipation of a future raising of the defense.

Thus, *Ruling # 10:* The defense of receipt for value in good faith under 11 U.S.C. § 548(c) and Minn.Stat. § 513.48(c) is not available to the lender-defendants, as to any amount paid to them by the Debtors in interest or on any account other than repayment of principal, because the Debtors did not receive "value" in return for the payments thus made. The same defense may be available to the lend-

---

**33.** *In re Churchill Mortg. Inv. Corp.*, 256 B.R. at 676, *aff'd*, 264 B.R. at 308; *In re Image Masters, Inc.*, 421 B.R. 164, 183 (Bankr. E.D.Pa.2009).

er-defendants as to an avoidance of repayments of principal that the Debtors made to them, upon invocation by responsive pleading and proof that they received such payments in good faith. The Trustee had no duty to anticipatorily plead facts going to the issue of the lender-defendants' receipt in good faith. His complaints are not deficient as to this issue.

## ISSUE # 11: ADEQUACY OF PLEADING ON INSIDER STATUS OF EMPLOYEE–DEFENDANTS.

### A. Introduction.

As part of his original "clawback" effort, the Trustee sued 26 individual defendants for the avoidance of transfers that had been made to them in connection with their employment by one or more of the Debtors. He alleged that these defendants had been insiders of one or more employer-Debtors when they received the transfers, in a specific sense under statute. For his legal basis of suit, the Trustee invoked Minn.Stat. § 513.45(b), under the empowerment of 11 U.S.C. § 544(b).[34] Were insider status properly pleaded and then proven, the substantive advantage to the estates under the state-law theory of suit is significant: the Trustee need not prove a lack of reasonably equivalent value as he must for a case of constructive fraud, and insider-defendants may be per se

barred from asserting good faith toward maintaining the affirmative defense of Minn.Stat. § 513.48(c). *See Bartholomew v. Avalon Capital Grp., Inc.,* 828 F.Supp.2d 1019, 1029 (D.Minn.2009), and Minnesota state cases cited there.

Most of the employee-defendants joined forces early in the litigation. They coordinated a common defense to the Trustee's claims. As part of that, they jointly argued that the Trustee had failed to plead sufficient fact allegations to make out insider status as to any of them, even if the Trustee's actual fact pleading were assumed to be true.[35]

This argument directly resonates with the Supreme Court's recent articulation of the standard for pleading, which requires "enough facts to state a claim to relief *that is plausible on its face." Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (emphasis added). In particular, a complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555, 127 S.Ct. 1955. Thus, after a canvassing of fact pleading to identify and segregate such empty assertions, the court is to "assume [the] veracity" of "well-pleaded factual allegations ... and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937,

---

**34.** As to empowerment of the Trustee under § 544(b), to wield avoidance powers under state law, *see* First Memorandum [Dkt. No. 1951] at 8, n. 6, 494 B.R. at 421 n. 6, and Eighth Circuit opinions cited there. The provision of MUFTA that gives special treatment to claims against insider-defendants is:

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Minn.Stat. § 513.45(b).

**35.** Many of the employee-defendants, including some alleged to have been insiders, engaged in mediation with the Trustee during the course of the consolidated-issues procedure, and quite a few settlements were reached. Fewer than a dozen adversary proceedings remain pending against employee-defendants alleged to have been insiders. In general, the amounts the Trustee seeks to recover from these remaining defendants are large; and the proceedings remain open and actively defended.

173 L.Ed.2d 868 (2009). As noted earlier, the statutory irrelevance of value to a prima facie case for Minn.Stat. § 513.45(b) benefits the estates; the possible issues in contention are significantly narrowed, and the latitude of defense is restricted. Given that impact, it is appropriate to require the Trustee to adequately plead the special status of insider for each such defendant sued in that capacity.

## B. Insider Status: Nature and Proof.

■ For avoidance litigation in a bankruptcy case, the determination of insider status "is a mixed question of law and fact and not merely a question of fact." *In re Rosen Auto Leasing, Inc.*, 346 B.R. 798, 803 (8th Cir. BAP 2006). Where, as here, a trustee relies on the empowerment of § 544(b) to invoke the state law of fraudulent transfer, insider status is governed by state law. However, the definition of the term "insider" under MUFTA is almost identical to the Bankruptcy Code's. Thus, "one can fairly make use of [case law construing] both to determine" whether a given defendant was an insider under one statute or the other. *In re Northgate Computer Systs., Inc.*, 240 B.R. 328, 362 (Bankr.D.Minn.1999).[36]

■ In the parts pertinent to this litigation, Minn.Stat. § 513.41(7) defines the term "insider" as:

(. . .)

(ii) if the debtor is a corporation,

 (A) a director of the debtor;

 (B) an officer of the debtor;

 (C) a person in control of the debtor;

 (D) a partnership in which the debtor is a general partner;

 (E) a general partner in a partnership described in clause (D); or

 (F) a relative of a general partner, director, officer, or person in control of the debtor;

 . . . .

(iv) an affiliate, or an insider of an affiliate as if the affiliate were the debtor; and

(v) a managing agent of the debtor.[37]

This non-exclusive roster of examples is essentially identical to the relevant part of 11 U.S.C. § 101(31).[38] Given the lack of case law authority under the Minnesota statute, the near-coincidence of the specific statutory texts, and the texts' placement in cognate statutes for the very same remedies, it is appropriate to consult judicial constructions of the Bankruptcy Code's definition to apply the Minnesota one.

■ Most of these provisions exemplify "insider" by concrete characteristics. However, the concept encompasses any entity that had "a sufficiently close relation-

---

36. In other contexts, the Eighth Circuit has expressly favored harmonizing the judicial construction of the states' enactments of the Uniform Fraudulent Transfer Act with the construction of 11 U.S.C. § 548, where the wording of applicable substantive provisions is closely cognate. *See* discussion in Amended Second Memorandum [Dkt. No. 2018], at 24 n. 32.

37. The statutory text that applies to debtors that are individuals or partnerships is not relevant here, and hence is not quoted.

38. The term "insider" includes—
 . . . .

(B) if the debtor is a corporation—
 (i) director of the debtor;
 (ii) officer of the debtor;
 (iii) person in control of the debtor;
 (iv) partnership in which the debtor is a general partner;
 (v) general partner of the debtor; or
 (vi) relative of a general partner, director, officer, or person in control of the debtor;
 . . . .
(E) affiliate, or insider of an affiliate as if such affiliate were the debtor; and
(F) managing agent of the debtor. 31

ship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." *In re Krehl,* 86 F.3d 737, 741 (7th Cir.1996) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. (1978) (cited *In re Dygert,* 2000 WL 630833 (Bankr.D.Minn. May 11, 2000))).

As a result, in construing § 101(31) the courts have referred to two categories: statutory insiders, i.e., those possessing an office or status among those enumerated in the statute; and non-statutory insiders, those who fall within the legislative intent for the definition but are "outside of any of the enumerated categories." *E.g., In re Winstar Commc'ns, Inc.,* 554 F.3d 382, 395 (3rd Cir.2009).

For all but one of the cited categories of statutory insider, the mere possession of the specified formal legal or contractual relationship with a corporate debtor, 11 U.S.C. § 101(31)(B)(i)-(ii), is enough to make a defendant an insider. This is a per se rule. As to directors, officers, and managing agents, it stems from the ability to influence corporate decision-making that customarily comes with such formal status. *In re El Comandante Mgmt. Co., LLC,* 388 B.R. 469, 474 (D.Puerto Rico 2008); *In re Badger Frtwys., Inc.,* 106 B.R. 971, 980–981 (Bankr.N.D.Ill.1989). Where a defendant holds the title of officer but the position is not vested with major decision-making authority in its own right, the possession of the titled status alone still suffices to make such a defendant an insider. *In re Fieldstone Mortg. Co.,* 2008 WL 4826291 (D.Md. Nov. 5, 2008).[39]

█ Thus, for defendants who are formal office-holders of any of the Debtors at bar, or who were familial relatives of such office-holders, the mere averment that the defendant held the status is sufficient to plead insider status plausibly.

**39.** Insider status is also assigned to defendants who have a familial relationship with a possessor of such a legal status with a corpo-

█ However, the one other alternative (under Minn.Stat. § 513.41(7)(ii)(c) and 11 U.S.C. § 101(31)(B)(iii)), "a person in control of the debtor," is fact-intensive. *In re ABC Elec. Servs., Inc.,* 190 B.R. 672, 675 (Bankr.M.D.Fla.1995). This sort of statutory insider status turns on "whether . . . the facts indicate an opportunity to self-deal or [to] exert more control over the debtor's affairs than is available to other creditors." *Id.*

█ The defendant must have "actual control (or its close equivalent)." *In re Winstar Commc'ns, Inc.,* 554 F.3d at 396. This actual control has been identified as "the ability of the [defendant] to 'unqualifiably dictate corporate policy and the disposition of corporate assets.'" *In re U.S. Medical, Inc.,* 531 F.3d 1272, 1279 (10th Cir.2008). A finding of actual control may be based upon the direction of "such things as the [d]ebtor's personnel or contract decisions, production schedules or accounts payable." *In re ABC Elec. Servs., Inc.* 190 B.R. at 675.

█ Given the expressly non-exclusive character of the statutes' enumeration, non-statutory insider status may be found on other aspects of a relationship between debtor and defendant. The issue is again fact-intensive, and the determination must be made on a case-by-case basis. *In re Richmond,* 429 B.R. 263, 297 (Bankr. E.D.Ark.2010); *In re A. Tarricone, Inc.,* 286 B.R. 256, 262 (Bankr.S.D.N.Y.2002). The courts have identified two major considerations for the determination:

1. the closeness of the relationship between debtor and defendant; and

2. the place of the transfers in a transaction that was conducted at arms-length, or not.

rate debtor (11 U.S.C. § 101(31)(B)(vi)). This type of insider status is not implicated in any of the adversary proceedings here.

*In re Winstar Commc'ns, Inc.*, 554 F.3d at 397–398; *In re Bruno Mach. Corp.*, 435 B.R. 819, 833 (Bankr.N.D.N.Y.2010). "[T]he degree of control or influence the transferee exert[ed] over the debtor" may be considered. *In re Oakwood Homes Corp.*, 340 B.R. 510, 523 (Bankr.D.Del. 2006). However, a showing of such "control is not required" for non-statutory insider status. *In re Winstar Commc'ns, Inc.*, 554 F.3d at 395–396.[40] And, a closeness of relationship alone is not sufficient to establish insider status for the avoidance of a particular transfer. There must also be something anomalous, beyond arms-length, about the transaction that featured the transfer. *In re Miller Homes, LLC*, 2009 WL 4430267 (Bankr. D.N.J. Nov. 25, 2009) (trusted lawyer for corporation-debtor could not be classified as insider for avoidance action; though lawyer had unusually close relationship to debtor-client, transaction in question appeared to have been conducted at arms length).

 Because non-insider status is fact-intensive, a plaintiff-trustee's assertion of it is *not to be finally determined on a motion to dismiss* as long as sufficient facts have been pleaded toward the two considerations. Clearly, those facts can vary greatly on a case-by-case basis. A few examples meriting the status appear in the previously-cited cases:

1. A major creditor to a deeply-indebted debtor-borrower forcing the debtor to purchase equipment long before it was actually needed and then forcing the turnover of other corporate monies by threatening to cut off

lending under a revolving facility. *In re Winstar Commc'ns, Inc.*, 554 F.3d at 394.

2. A golf buddy of a statutory insider of the debtor, who was a former director of the debtor himself, having made a $200,000.00 loan to the debtor without having performed due diligence and on the request of the statutory insider alone. *In re A. Tarricone, Inc.*, 286 B.R. at 269–270.

3. A close personal friend of the owner of a corporation-debtor who made an unsecured loan of $300,000.00 to his friend's company without inquiring into the company's ability to pay. *In re Bruno Mach. Corp.*, 435 B.R. at 834–835.

4. A lawyer who maintained a close personal relationship with the company's owner and who then participated in the fraudulent activities of the debtor. *In re Continental Capital Inv. Servs., Inc.*, 2006 WL 6179374 (Bankr.N.D.Ohio 2006).

### C. Pleading Standard for Insider Status, in Application.

In general, the Trustee's pleading for insider status is terse, across all of the complaints against employee-defendants. Its content separates out in line with the case law's analysis, though most of the complaints allege in the alternative that a particular defendant held insider status on two or three different bases.

### 1. Defendants Alleged to be Insiders in Capacity of Officers or Directors of a Debtor. Minn.Stat. § 513.41(7)(ii)(A)–(B).

As an example involving a specific status as an officer or director of a referent Debt-

---

**40.** The *Winstar Commc'ns* court appropriately reached this conclusion from the incongruity that would otherwise arise from the full content of the statute. Were a high degree of control required for non-statutory insider sta-

tus, the option for *statutory* insider status as "a person in control of the debtor," § 101(31)(B)(iii), would render meaningless the nonexclusivity of the statutory enumeration. 554 F.3d at 396.

or, the Trustee's complaint against David Baer read:

> Defendant was the Chief Legal Officer of PCI and PGW and, consequently, had special knowledge or access to information regarding the Ponzi scheme, was a control person of PCI and PGW, and was an insider within the meaning of Section 101(31) of the Bankruptcy Code.

Complaint, *Kelley v. Baer*, ADV 10–4370 [Dkt. No. 1, ¶ 44]. There is a simple identification of the defendant as the holder of a specific corporate office with two named Debtors, held at all times relevant to the Trustee's fraudulent transfer claims.[41] Given the per se operation of Minn.Stat. § 513.41(7)(ii)(B), this is the only fact essential to pleading this sort of insider status, as to such a defendant. For any defendant expressly alleged to have held a status designated as "officer" for one of the Debtors, particularly an office designated in articles or bylaws; or for any defendant alleged to have been a "director" in the sense of a member of a governing board, such a statement of fact will suffice as a plausible basis for insider status under Minn.Stat. § 513.41(7)(ii)(A)–(B).

## 2. Defendants Alleged to Have Been Insiders of Affiliates of a Debtor. Minn.Stat. § 513.41(7)(iv).

For other defendants, the Trustee pleaded derivative statutory insider status under the rubric of being an insider of an affiliate of one of the Debtors (in the sense of being an officer, director, or in control of that entity). Generally, this was coupled with the pleading of non-statutory insider status as to a Debtor or an affiliate,

under comparable considerations that did not expressly allege control. For instance,

> Defendant was the President of Petters International, a wholly owned subsidiary of PGW, and CEO of Petters Consumer Brands, LLC. Consequently, Defendant had special knowledge or access to information regarding the Ponzi scheme, was a control person of Petters International and Petters Consumer Brands, LLC, and was an insider within the meaning of Section 101(31) of the Bankruptcy Code.

Complaint, *Kelley v. O'Shaughnessy*, ADV 10–4401 [Dkt. No. 1, ¶ 44].[42]

> Defendant was the President of Petters International, a wholly owned subsidiary of PGW, and CEO of Petters Consumer Brands, LLC. Consequently, Defendant had special knowledge or access to information regarding the Ponzi scheme, was a control person of Petters International and Petters Consumer Brands, LLC, and was an insider within the meaning of Section 101(31) of the Bankruptcy Code.

Complaint, *Kelley v. Harmer*, ADV 10–4372 [Dkt. No. 1, ¶ 44];

> Defendant is a former Deputy Chief Legal Counsel of PGW, General Counsel for SpringWorks, LLC and General Counsel for Polaroid Corporation, both subsidiaries of PGW, and was part of Petters' and his affiliated entities' management team and inner circle. Consequently, he is an insider within the meaning of Section 101(31) of the Bankruptcy Code.

Complaint, *Kelley v. Phelps*, ADV 10–4342 [Dkt. No. 1, ¶ 44]; and

---

**41.** While fairly terse in the quoted allegations, the Baer complaint does simultaneously plead toward all three alternatives for insider status.

**42.** The quoted paragraph does not include an allegation that any of the named companies (for which defendant O'Shaughnessy is alleged to have served as an officer), were sub-

sidiaries of any of the named Debtors. The record in other litigation in these and the *Polaroid Corporation* cases suggest that the full ownership of the Polaroid Corporation and its affiliates was traceable up into Debtor PGW.

Defendant is the former Chief Executive Officer of SpringWorks, LLC, a wholly owned subsidiary of PGW, and was part of Petters' and his affiliated entities' management team and inner circle. Consequently, he is an insider within the meaning of Section 101(31) of the Bankruptcy Code.

Complaint, *Kelley v. Danko*, ADV 10–4339 [Dkt. No. 1, ¶ 44].

Such pleading does allege enough for insider status as an insider of an affiliate of a debtor-transferor, Minn.Stat. § 513.41(7)(iv), when one assumes as true the recitation of status as officer with a subsidiary of one of the named Debtors.[43]

Where the Trustee pleads such affiliate-insider status, he usually tries to augment it by alleging the possession of "control," whether over the affiliates or over the Debtors. This is usually done in summary fashion, coupled with the allegation of membership in a "management team and inner circle" to support an allegation of de facto "control of the debtor." To similar attempted effect, the O'Shaughnessy complaint, quoted previously, pleads the status of "control person of" a Debtor, which is alleged to have featured the ability "to exert influence over the Debtors and attain (sic) [the] excessive Transfers." As to such defendants, the only fact pleading is this unspecified "close relationship" to a referent Debtor or Debtors, a connotative phrasing of an informal status that is supposed to equate without more to the historical de facto *exercise* of "control of the debtor."

This sort of inferential jump in pleading makes sense for high corporate officers of a debtor itself, and probably for officers of an affiliate that is alleged to be operationally intertwined with a debtor. For in-

stance, a chief executive officer by nature makes and executes decisions that affect the full range of a corporate entity's operations. A CEO both is vested with control, and presumptively exercises it. That inferential process is entirely natural for the very top officer of a corporation; and it must apply absent specific pleading (responsive or otherwise) of figurehead or dummy status with a mere title.

For any other officer status with a debtor or an affiliate, particularly ones outside the top recognized echelons of CEO or other management-officers, the terse pleading of an individual defendant's membership in an "inside circle" or the maintenance of a close relationship with a debtor or its principal, coupled or not with the words "control" or influence, is only a "label or conclusion." Here, if such an averment is directed toward an additional statutory-insider status as a person in control, it must be accompanied by some pleading of *acts* of real exercise of decisive control over one of the Debtors, or at least control over important, major functions of the Debtor's business. To the extent that such pleading is lacking and there is no pleading of *per se* insider status as officer or director, a complaint does not plausibly state the case under Minn.Stat. § 513.41(7)(ii)(C) and that alternative claim of insider status may not be maintained under it.

### 3. Allegation of Membership in "Management Team and Inner Circle" as Basis for Non–Statutory Insider Status. Minn.Stat. § 513.41(7), in General.

For most or all defendants, the Trustee seemed to plead the more generalized status of non-statutory insider in the alternative to one or more of the other classes. For a small group, this appeared to be the only pleaded classification. The following

---

43. A subsidiary in which a debtor in bankruptcy holds at least 20% of the outstanding voting securities is an "affiliate." 11 U.S.C. § 101(2)(B).

is the most salient such pleading among the adversary proceedings still pending:

Defendant is the former Executive Vice–President of Sales for a number of Petters entities, PGW, Petters Consumer Brands, LLC, Brand Management Americas, and Polaroid Corporation and the former Vice–President of Sales for RedTagOutlet.com, also a PGW subsidiary. He also was identified by Petters as a "Strategic Partner" with special access to Petters and his Associates and was an influential part of Petters' and his affiliated entities' management team and inner circle at all times relevant herein. By virtue of his close relationship with Petters, his Associates and the Debtors, Defendant was able to exert influence over the Debtors and attain excessive Transfers. Consequently, he is an insider within the meaning of Section 101(31) of the Bankruptcy Code.

Complaint *Kelley v. Ratliff*, ADV 10–4409, ¶ 45. This pleading lacks a basis for statutory-insider status, whether position- or control-derived. By its very wording, the identified position, "Executive Vice–President of Sales," cannot denote the sort of control over general policy and full operations held by those in the status of director or upper officer. If the averments of this complaint could qualify for insider status at all, it would have to be under the rubric of non-statutory insider.

Because the cases have emphasized the fact-intensive nature of this classification, the *Twombly/Iqbal* standard clearly puts a premium on specificity in pleading for it. A bare recitation that a defendant had a favored spot on a "team" or "circle" speaks nothing to the nature of the challenged transfer or the surrounding transaction as arms-length or anomalous. It does not speak in any decisive way to the "closeness" of a relationship, or to the degree of true access or power derived from it. (After all, the "team" or "circle" around a charismatic but amoral schemer can in-

clude individuals who are not really in the know, who function only as "yes-persons," whose actual interface with the action of corporate governance is sporadic or shallow, or who function as window-dressing toward a facade of inclusiveness and objectively-based decision-making. History features many examples of such.)

The fact-pleading for non-statutory insider status must go beyond a conclusory recitation of such membership. As one alternative, there should be more specific allegations of the frequency, nature, setting, and quality of the interaction between the alleged insider-defendant and the Debtor and its governing principles. As to defendant Ratliff, that is satisfied by the allegation that he had "Strategic Partner" status, conferred by Tom Petters himself, and that this entailed both "special access" to Petters and his confederates (i.e., those individuals involved in the operation of the Ponzi scheme) and "influence over the Debtors" toward levering the challenged payments to him.

As importantly, the Trustee's complaints against employee-defendants must also be measured as to the arms-length character of transfers made to defendants in the course of employment relationships, measured objectively, as another point of fact bearing on insider status. In their briefing, the employee-defendants argue that the Trustee's pleading is devoid of such detail.

This is not entirely fair to the Trustee because the argument on this point focused exclusively on the complaints' single paragraph that went specifically to insider status. It ignored the rest of the complaints' text. In pursuing the avoidance of such transfers characterized as unwarranted bonus payments and overly-lavish compensation, the Trustee did include separate fact-pleading to support his case on constructive fraud: allegations that the magnitude of payments made at Tom Pet-

ters's direction was grossly in excess of the reasonable value of services that the employees had actually rendered to their employing Debtors. The adequacy of the Trustee's pleading against employee-defendants on the reasonable equivalence of these values was analyzed in the second stage of the consolidated-issues presentation, and that pleading was ratified as to plausibility. Amended Second Memorandum [Dkt. No. 2018], 45–48.

Those same facts relate reasonably well to the issue of arms-length character or lack thereof, in the sense of normality versus anomality, as it bears on non-statutory insider status.[44] To the extent that the Trustee averred that challenged payments significantly exceeded general norms for employee compensation or any other disbursement of an unusual character or amount, his pleading will meet muster for plausibility under the second consideration. And, such fact averments need not be in proximity to any more conclusory assertion of a defendant's insider status, or even feature a pleaded cross-reference between the relevant parts of the text.

#### 4. Conclusions.

 Thus, *Ruling # 11:* For any defendant who was an employee of any Debtor or an affiliate of a Debtor, the Trustee adequately pleads the status of insider within the examples enumerated in MUFTA when he avers that such a defendant held the position of officer or director with a named Debtor in these cases; or with a named company identified as a subsidiary of such a Debtor and qualifying as an affiliate of that Debtor under applicable law. To plead the status of insider as a "person in control of" a Debtor under applicable statute, an averment solely of that defendant's membership in a "management team" or an "inner circle" formed by persons who were legally in control of a Debtor, is not sufficient; the Trustee must also plead additional facts going to the defendant's actual exercise of decisive control over a Debtor or important, major functions of a Debtor. To plead insider status on grounds other than those enumerated in applicable statute, the Trustee must plead that a defendant had a status with, or access to, persons in control of a Debtor, with a corresponding close relationship and the opportunity to influence the decision-making for the Debtor's activities, and coupled with specific allegations that the transfers to the defendant were not at arms length.

### ISSUE # 12: ACTIONABILITY OF CLAIMS FOR UNJUST ENRICHMENT OR OTHER EQUITABLE REMEDIES ON SAME PLEADED FACTS AS CLAIMS FOR AVOIDANCE OF FRAUDULENT TRANSFER.

#### A. Introduction.

As an alternate substantive theory of recovery, the Trustee pleaded claims un-

---

44. An observation as to a nuance that some defendant will probably raise later: yes, the notion of a transaction not at arms-length can carry the connotation of overreaching, excessive influence, manipulation, on up to overt coercion. And, of course, such exploitation logically presupposes an inducement that overwhelms resistance, or some other manipulative exercise of control over the transferor. Such control likely was not possessed by administrative-employee recipients of bonuses, or even some specialized corporate officers within the Petters enterprise structure. In context, however, the use of the phrase "arms-length" for this consideration is more appropriately read as a reference to the character of the transfer itself, i.e., whether it falls within a range of normality for similar surrounding circumstances, than it is to the motive power exercised to bring about the transfer. Of the four examples of transactional backdrop cited for non-statutory insider status at pp. 367–68, *supra,* only one involved a formal legal structure through which threats could convincingly be enforced and decisive de facto control could be exploited.

der the rubric of equity against most or all of the defendants, specifically unjust enrichment or "equitable disgorgement." He based these claims on an incorporation-by-reference of all the same fact allegations on which he brought his fraudulent-transfer claims, without pleading additional factual matter. An example of the text for these claims is found in his complaint against defendant David Baer:

107. At all times relevant hereto, all funds received by Defendant were part and parcel of the Ponzi scheme and were derived from monies fraudulently obtained by Petters and PCI and from other investors or participants in the Ponzi scheme.

108. Defendant, as the recipient of fraudulently obtained proceeds of the Ponzi scheme has no rightful or legitimate claim to such monies.

109. Defendant knowingly received monies from the Debtors and those monies were derived from the Ponzi scheme, and he was unjustly enriched through his receipt of the fraudulently obtained monies to the detriment of the PCI and PGW estates, and in equity and good conscience must be required to repay the proceeds received.

110. Defendant would be unjustly enriched to the extent he is allowed to retain the monies and proceeds received during its participation in the Ponzi scheme.

111. Defendant must, therefore, in equity be required to disgorge all proceeds received through the operation of the Ponzi scheme, so as to allow the Trustee to distribute in equity any such ill-gotten gains among all innocent investors and creditors of PCI and PGW.

Complaint, *Kelley v. Baer*, ADV 10–4370, ¶¶ 107–111.

The Trustee's assertion of these claims generated a welter of arguments for dismissal from the defense.[45] In number and nature, most of them parallel the defense's multiple attacks on the Trustee's fraudulent transfer claims:

1. *Standing:* Does the Trustee assert standing to sue the defendants on unjust enrichment claims under 11 U.S.C. § 105(a), or derivative to the right of a creditor pursuant to 11 U.S.C. § 544(b)?[46] If the latter, how does the Trustee's assertion of standing meet governing Eighth Circuit precedent, i.e., *In re Ozark Rest. Equip. Co.*, 816 F.2d 1222 (8th Cir.1987)? And if he does, must the Trustee identify a specific creditor from which he derives standing, and is he required to name a creditor that was injured by the specific transfers the Trustee would have avoided, i.e., that had an unpaid claim against a Debtor at the very time of the transfer?

2. *The Scope of Asserted Remedy:* If the Trustee has a platform for derivative standing to sue any particular defendant under § 544(b), is a claim for monetary relief on the ground of unjust enrichment the sort of right of action with which § 544(b) vests him? Put another way, does the recovery of a money judgment equate to the avoidance of a transfer of an interest of the debtor in property that is

---

**45.** Most of these arguments were best and most fully articulated by the defendants in *Kelley v. General Electric Capital Corp.* [ADV 10–4418] and *Kelley v. Westford Special Situations Master Fund, L.P., et al* [ADV 10–4396]. However, when it came time to brief their own motions and then to line up for the consolidated-issues treatment, numerous defendants took benefit from the work of these heavy lifters and adopted their arguments by reference.

**46.** For the nature of the vesting of standing under § 544(b), *see* First Memorandum [Dkt. No. 1951], 8 n. 6.

specified as the remedy that § 544(b) vests in a trustee?

3. *Adequacy of Pleading:* Is the Trustee required to plead that a defendant acted illegally or unlawfully in receiving the subject transfers? Need the Trustee plead knowledge on the part of a defendant-transferee, that it was receiving something of value to which it was not entitled?

4. *Actionability of Transfers Received Pursuant to Contract:* May a party claiming to be aggrieved under an unjust-enrichment theory, on account of past third-party transfers made by its debtor, recover from a transferee that received the transfers pursuant to a contract, which the transferee asserts to have been regular on its face and valid and legally enforceable at that time?

5. *Timeliness of Suit:* Though there is no dispute that the Trustee's unjust enrichment claims are subject to a six-year limitations period under Minn.Stat. § 541.05, Subd. 1(1), which began at the time the subject transfers were made,[47] was this period subject to tolling under the fraudulent concealment doctrine, on account of the clandestine activity of Tom Petters and his confederates in concealing the Ponzi scheme?

6. *Defense of In Pari Delicto:* Are the Trustee's claims for unjust enrichment barred by the doctrine of in pari delicto?

7. *Equitable Remedies and Legal Remedies:* Is the Trustee barred from asserting the equitable remedy of unjust enrichment as to the same transfers he seeks to have avoided as fraudulent transfers, a remedy at law, where he relies on the very same facts in invoking both remedies?

## B. Resolution (Occam's Razor in Action).

■ Airing, examining, and ruling on these issues would have required another lengthy memorandum for them alone. It would have been another grueling task of adjudication. And, the effort would have been put to a theory of recovery that was only asserted in the alternative, a lawyerly hedge on the part of the Trustee and his counsel.

That burden was eased by the issuance of an opinion from the Eighth Circuit Court of Appeals only seven weeks ago. *United States v. Bame,* 721 F.3d 1025 (8th Cir.2013) specifically addresses the propriety of jointly invoking the very same bank of remedies, in litigation with a comparable posture, against the recipient of transfers from a plaintiff's debtor. This is the very same subject as the seventh subsidiary-issue just summarized. The treatment of it in *Bame* preempts the Trustee's whole position and the rest of the defense's contentions alike. It cuts down the whole controversy between the parties at bar, and enables a complete resolution right now.

*Bame* was an action by the United States to redress the erroneous disbursement of over half a million dollars to an individual, Fred Bame, in the form of an income tax refund to which he was not entitled. Fred Bame negotiated the check and dissipated the funds quickly. He used a major part of the money to settle third-party debts owed by his ex-wife Jo Anna Bame. (The marriage between Fred and Jo Anna had been legally dissolved four years before the issuance of the erroneous tax refund. But, per the Eighth Circuit's recitation of facts, the two clearly had a

---

**47.** *Bonhiver v. Graff,* 311 Minn. 111, 248 N.W.2d 291, 296 (1976); *Block v. Litchy,* 428 N.W.2d 850, 854 (Minn.Ct.App.1998).

continuing personal relationship and cooperation.)

Fred Bame died in 2007. The Government tried to recoup its loss through the probate process. That effort was unavailing. It then pursued a recovery from surviving ex-wife Jo Anna and two business entities owned by her. (The corporate defendants were associated with the operation of a resort in Canada. The resort had previously been owned by Fred and Jo Anna, successively, in their individual capacities.)

The Government's lawsuit was styled in ways familiar to the participants in the PCI/PGW litigation: claims in the alternative for avoidance of fraudulent transfers and for recovery under equitable theories—money had and received and unjust enrichment. Jo Anna's motion to dismiss the fraudulent transfer count on adequacy of pleading was denied. *United States v. Bame*, 778 F.Supp.2d 988 (D.Minn.2011). The parties later brought cross-motions for summary judgment on all counts. The district court granted summary judgment for the United States on the unjust enrichment claim. It "did not discuss or rule on the statutory claims, noting only that they 'raised several issues' which the court 'need not address.'" *United States v. Bame*, 721 F.3d at 1028.

Jo Anna appealed on alternate arguments. The first was that summary judgment had been inappropriately granted due to the existence of triable fact issues on her affirmative defenses (good faith and legal "entitlement to the money"). The second was that the equitable remedy of unjust enrichment was unavailable to the Government on the facts pled in common for all counts, in light of the simultaneous assertion of other claims that sounded in law.

The Eighth Circuit agreed with Jo Anna on her arguments under Rule 56(c). It

held that the record contained enough evidence to support findings in her favor on both of her defenses. The grant of summary judgment was reversed and the matter was remanded for further proceedings. 721 F.3d at 1029.

But, the *Bame* panel went on to discuss Jo Anna's alternate argument for appeal, and at some length. It "point[ed] out the following regarding the unjust enrichment claim ... [for] considera[tion] by the district court on remand"—even though the reversal on procedural grounds meant that the circuit court "need not resolve [the second issue] at this time." 721 F.3d at 1029–1030.

The ensuing discussion is trenchant.

■ It starts with Minnesota law's recognition of a fundamental precept of equity jurisprudence—that a "party may not have equitable relief where there is an adequate remedy at law available." 721 F.3d at 1030 (citing *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn.1996)). It then cites a half-dozen recent decisions in which the United States District Court for the District of Minnesota applied this general precept, to dismiss claims for monetary recovery on unjust-enrichment theories where various statutes provided the plaintiff with remedies at law on the same facts. *Id.* These included cases where the alternate pleaded claims at law were based on MUFTA. *Id.* (citing, *inter alia, Kelley v. College of St. Benedict*, 901 F.Supp.2d 1123, 1132 (D.Minn.2012)).

Directly to the point of the Trustee's rejoinder at bar, the *Bame* court observed that "[t]he issue here is not one of pleading" in the alternative, as a strategic hedge to preserve an equitable remedy for invocation after the failure of one at law. 721 F.3d at 1031. Rather, "it is the *existence* of an adequate legal remedy that pre-

cludes unjust enrichment recovery." *Id.* (emphasis added). Even more pointedly,

> ... [i]t should make no difference that [a plaintiff] pleaded and pursued its statutory claims.... It would be anomalous to allow unjust enrichment recovery, despite law to the contrary, merely because the plaintiff fashioned the pleadings in a certain way.

*Id.* And finally, the abstract applicability of statutory fraudulent transfer remedies to such common events and facts clears equitable remedies off the field, even if the statutory remedies are time-barred by the statute of limitations. This includes the remedy of unjust enrichment. *Id.*

Yes, these pronouncements are dicta. However, they are a powerful advisory endorsement of a straight line of authority in the very trial court to which remand was being made. They are an unmistakable exhortation to track with that authority consistently, after the specific, procedurally-oriented mandate of the remand was addressed as a preliminary. *Id.* ("But all matters relating to the unjust enrichment claim are for the district court's further consideration on remand.")

As one might say colloquially, there is dictum, and there is dictum. That is to say, on the one hand judges do make offhanded observations on the legal import of rulings at bar, to hypothetical extensions of the facts before them. They do this sometimes to better frame or illustrate the disposition they are about to make, by a contrast. They sometimes use it to highlight a threshold principle that is not itself at issue. Often judicial dictum is only an engagement in abstract, semi-speculative observations, on subject matter that has become a preoccupation for the presiding

judge through the intensity of parsing the more specific matter at hand.[48]

But on the other hand, judges do have to anticipate the next dispute upcoming in the very litigation at bar before them, if it is not terminated by rulings on the procedure at hand. They sometimes try to channel the handling and presentation of those issues by extending the rulings at hand. This can be a valid warrant to make observations that are technically dictum. It has its justification in the judicial duty of case administration, not to mention a judge's personal impulse to simplify future tasks in cases that have already been difficult and time-consuming. And unquestionably, judges have an obligation to rein in the accrual of public and private costs toward the resolution of large controversies. Nudging the parties in a particular, precedent-structured direction can promote that. Dictum of this sort is always given with the tacit understanding that a final, binding ruling will await an opportunity for the parties to submit persuasion to the contrary. However, when observations like this are presented in a careful form and a firm, principled, and supported manner, they should be heeded.

Here, the extended statements in *Bame* not only should be heeded; they must. The reasoning of the discussion is that tight, as to the unavailability of alternate equitable remedies due to the primacy of pleaded legal remedies. It is also founded in clear, indisputable, and longstanding case law authority.

Under *Bame*'s reasoning, only one ruling is possible and only one ruling is necessary. It moots all of the defense's other contentions with the Trustee's claims for unjust enrichment.

---

**48.** One is minded of H.L. Mencken's oft-quoted observation: "A judge is a law student who marks his own examination papers."

Thus, **_Ruling # 12:_** The Trustee may not simultaneously maintain his claims for avoidance of transfers as fraudulent under statute, and his claims for monetary recovery under the equitable theory of unjust enrichment, as to the same transfers and on the same pleaded facts. Because the equitable remedy is not available to the Trustee due to the existence of fraudulent transfer remedies in his favor and his pleading and maintenance of those claims, all of his unjust enrichment claims against all defendants must be dismissed.

## CONCLUSION

The rulings on this third and final group of issues are reprised as follows:

**_Ruling # 8:_** The Trustee is not barred from invoking fraudulent-transfer remedies as to transfers of money made by the Debtors, in repayment to those defendants that had previously lent money to the same Debtors, merely because the payments were made on transactions documented as loans and treated as such by the parties thereto. As long as the Trustee adequately pleads that the transfers in loan repayment were made in furtherance of a Ponzi scheme, they are actionable as actually- or constructively-fraudulent.

**_Ruling # 9:_** The Trustee cannot exercise the power of avoidance under the constructive-fraud theories of applicable statute as to any Debtor's repayment to any defendant of principal on a loan or other extension of credit previously made by that defendant to the Debtor, because that repayment gave reasonably equivalent value to the Debtor via the satisfaction of a preexisting debt on a claim for restitution. However, on behalf of the appropriate bankruptcy estate, the Trustee may avoid, as a constructively-fraudulent transfer within the scope of 11 U.S.C. § 548(a)(1)(B) and Minn.Stat. §§ 513.44(a)(2) and 513.45(a), that portion of any payment to any such defendant that

was in excess of the amount of principal paid, whether denominated as profit, interest, or otherwise, because the paying Debtor did not receive a reasonably equivalent value from the defendant in exchange for the payment.

**_Ruling # 10:_** The defense of receipt for value in good faith under 11 U.S.C. § 548(c) and Minn.Stat. § 513.48(c) is not available to the lender-defendants, as to any amount paid to them by the Debtors in interest or on any account other than repayment of principal, because the Debtors did not receive "value" in return for the payments thus made. The same defense may be available to the lender-defendants as to an avoidance of repayments of principal that the Debtors made to them, upon invocation by responsive pleading and proof that they received such payments in good faith. The Trustee had no duty to anticipatorily plead facts going to the issue of the lender-defendants' receipt in good faith. His complaints are not deficient as to this issue.

**_Ruling # 11:_** For any defendant who was an employee of any Debtor or an affiliate of a Debtor, the Trustee adequately pleads the status of insider within the examples enumerated in MUFTA when he avers that such a defendant held the position of officer or director with a named Debtor in these cases; or with a named company identified as a subsidiary of such a Debtor and qualifying as an affiliate of that Debtor under applicable law. To plead the status of insider as a "person in control of" a Debtor under applicable statute, an averment solely of that defendant's membership in a "management team" or an "inner circle" formed by persons who were legally in control of a Debtor, is not sufficient; the Trustee must also plead additional facts going to the defendant's actual exercise of decisive control over a Debtor or important, major functions of a Debtor. To plead insider status on

grounds other than those enumerated in applicable statute, the Trustee must plead that a defendant had a status with, or access to, persons in control of a Debtor, with a corresponding close relationship and the opportunity to influence the decision-making for the Debtor's activities, and coupled with specific allegations that the transfers to the defendant were not at arms length.

*Ruling # 12:* The Trustee may not simultaneously maintain his claims for avoidance of transfers as fraudulent under statute, and his claims for monetary recovery under the equitable theory of unjust enrichment, as to the same transfers and on the same pleaded facts. Because the equitable remedy is not available to the Trustee due to the existence of fraudulent transfer remedies in his favor and his pleading and maintenance of those claims, all of his unjust enrichment claims against all defendants must be dismissed.