# United States Bankruptcy Appellate Panel

## For the Eighth Circuit

_____

Nos. 16-6034 and 16-6035

_____

In re: Top Hat 430, Inc., Formerly doing business as Top Hat, Inc., doing business as Be Iced Jewelers, doing business as Be Iced Diamond Exchange, doing business as Gold Stop, doing business as Bidx

*Debtor*

------------------------------

Randall L. Seaver, Trustee

*Appellant/Cross-Appellee*

v.

Pennie Glasser

*Appellee/Cross-Appellant*

_____

Appeals from United States Bankruptcy Court
for the District of Minnesota - Minneapolis

_____

Submitted:  April 26, 2017
Filed:  June 12, 2017

_____

Before SALADINO, Chief Judge, FEDERMAN and SHODEEN, Bankruptcy
Judges.

_____

FEDERMAN, Bankruptcy Judge

Randall L. Seaver, Chapter 7 Trustee in the bankruptcy case of Top Hat 430,
Inc., filed suit against Pennie Glasser, seeking to recover from her, as a preference,
a payment made by the Debtor to her. Since the payment was made more than ninety
days, but less than one year, prior to its filing bankruptcy, the Trustee can only
prevail if Ms. Glasser is found to have been an insider of the Debtor at the time of
payment. Ms. Glasser is the former wife of an insider of the Debtor, as well as a
minor investor and employee of the Debtor at the time of payment. The Bankruptcy
Court[1] held that Ms. Glasser was not an insider of the Debtor. Therefore, the
payment was not an avoidable preference pursuant to 11 U.S.C. § 547(b) and
Minnesota Statute § 513.45(b). The Trustee appeals, and Ms. Glasser cross-appeals
the finding that, even though she was not an insider, the transaction between her and
the Debtor was not at arm's length. For the reasons that follow, we AFFIRM.

## FACTUAL BACKGROUND

Top Hat, Inc., was founded in 2004 by David Pomije, Sr. and Duane
Wermerskirchen, and operated under the name of "Be Iced Jewelers." Pennie
Glasser and her current husband, David Glasser, were stockholders of Top Hat, Inc.,
owning approximately 2.1% of the company's stock.

---

[1] The Honorable Michael E. Ridgway, United States Bankruptcy Judge for
the District of Minnesota.

Top Hat 430, Inc. the Debtor in this case, operated retail jewelry stores, buying and selling new and used jewelry, precious metals, and gemstones. In 2012, Top Hat 430 merged with Top Hat, Inc., with Top Hat 430 (the "Debtor") emerging as the surviving entity. Mr. Pomije was the president of the Debtor and had control over its operations.

Pennie Glasser and Mr. Pomije had been married from December 1985 through February 1997, prior to the formation of the Debtor. They share three children, all of whom are grown. During the marriage, Ms. Glasser worked at two companies founded by Mr. Pomije, namely, Protectronics, Inc. and Funco, Inc. After the marriage ended, Ms. Glasser continued to work for other companies founded by Mr. Pomije, including 2nd Swing, Inc. and the Debtor. The couple's son also worked for the Debtor. Ms. Glasser testified that, due to Mr. Pomije's past successes, she had confidence in him as a business person.

In March of 2011, which was before Ms. Glasser went to work for the Debtor, Mr. Pomije approached the Glassers (among other potential lenders) regarding a bridge loan for the Debtor. The bridge loans were intended to be short term loans which would be repaid from a new capital infusion, for which Mr. Pomije would seek investors. David Glasser negotiated the terms of the Glassers' loan with Mr. Pomije. As a result of those negotiations, on March 31, 2011, Mr. Pomije signed, on behalf of the Debtor, a promissory note in favor of the Glassers in the amount of $200,000. The terms of the note provided for repayment of the $200,000 principal within 90 days without interest, a $10,000 origination fee, and a 20% interest rate if default occurred. Mr. Pomije personally guaranteed the note. Shortly after this loan was made, Ms. Glasser went to work sorting jewelry at the corporate office for the Debtor. Ms. Glasser testified she went to work at the Debtor because she wanted to "get out of the house."

Several other people also made bridge loans to the Debtor. There is no evidence that the Debtor repaid the principal on any of those loans within 90 days. However, it did make interest payments, including $36,555.55 to the Glassers, from the middle of 2011 through early 2012. Meanwhile, Mr. Pomije was working on raising capital to repay the bridge loans and operate the company. As part of those efforts, in November 2011, the Debtor issued a Private Placement Memorandum ("PPM") intending to raise $8 million in capital. The PPM described the lenders and terms of the bridge loans, and provided that $1.3 million of the capital raised would be used to pay bridge loans. As a result of the PPM, the Debtor raised $4 million in capital on or about April 13, 2012.[2] Using those funds, the Debtor made a payment in the amount of $205,444.45 to the Glassers on April 19, 2012, paying the note in full. Some of the other bridge loans were also paid, but not all of them. In addition, a few, but not all, creditors with accounts over ninety days were paid. The evidence at trial was that it was Mr. Pomije who decided which creditors to repay with the $4 million capital infusion.

Less than a year later, on February 12, 2013, the Debtor filed a Chapter 11 bankruptcy case. The case was converted to Chapter 7 on March 25, 2013, and the Chapter 7 Trustee filed an adversary proceeding against Ms. Glasser for recovery of the payment as a preference, asserting that she was a non-statutory insider, and so the one-year lookback period in § 547(b)(4) applied. Mr. Glasser was not named as a defendant in the preference action.

Following a trial, the Bankruptcy Court entered judgment in favor of Ms. Glasser, finding that, although the transaction was not at arm's length, she was not an insider. The Trustee appeals. And, although Ms. Glasser prevailed as to the

_____

[2] A publicly held company purchased a 20% share of the Debtor's preferred stock for $4 million in cash.

outcome, she cross-appeals the conclusion that the transaction was not at arm's length.

## STANDARD OF REVIEW

Generally speaking, we review findings of fact for clear error and conclusions of law *de novo*.[3] However, as we commented in *In re Rosen Auto Leasing, Inc.*, the appropriate standard of review for a determination of non-statutory insider status is in dispute.[4] Indeed, the United States Supreme Court recently granted certiorari on the question of whether review is *de novo*, clearly erroneous, or a combination of both.[5] In *In re Rosen Auto*, we said we believed the determination is a mixed question of law and fact and, until the Supreme Court says otherwise, we adhere to that opinion. Nevertheless, as was the case in *Rosen Auto*, we would reach the same result under either standard of review.

## DISCUSSION

Section 547(b) of the Bankruptcy Code provides that a trustee may avoid the transfer of an interest of the debtor in property –

(1) to or for the benefit of a creditor;

---

[3] *Addison v. Seaver* (*In re Addison*), 540 F.3d 805, 809 (8th Cir. 2008).

[4] *Stalnaker v. Gratton* (*In re Rosen Auto Leasing, Inc.*), 346 B.R. 798, 803 (B.A.P. 8th Cir. 2006).

[5] *U.S. Bank N.A. v. The Village at Lakeridge, LLC* (*In re The Village at Lakeridge, LLC*), 814 F.3d 993 (9th Cir. 2016), *cert. granted*, 137 S.Ct. 1372 (2017) (the Ninth Circuit holding that establishing the definition of non-statutory insider status is reviewed *de* novo, but whether a specific person qualifies as such an insider is a question of fact reviewed for clear error; the Third, Seventh, and Tenth Circuits holding that review is *de novo*).

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made--

> (A) on or within 90 days before the date of the filing of the petition; or

> (B) *between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider*; and

(5) that enables such creditor to receive more than such creditor would receive if--

> (A) the case were a case under chapter 7 of this title;

> (B) the transfer had not been made; and

> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.[6]

"The Trustee bears the burden of proving each of these elements by a preponderance of the evidence."[7]

Section 513.45(b) of the Minnesota Statutes, on which the Trustee also relied, provides:

A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider

---

[6] 11 U.S.C. § 547(b) (emphasis added).

[7] *Doeling v. O'Neill* (*In re O'Neill*), 550 B.R. 482, 514 (Bankr. D. N.D. 2016) (citing *Stingley v. AlliedSignal, Inc.* (*In re Libby Int'l, Inc.*), 247 B.R. 463, 466 (B.A.P. 8th Cir. 2000)).

for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.[8]

In order for the Trustee to prevail under either statute, the Trustee was required to prove that Ms. Glasser was an insider of the Debtor, which is the sole issue presented in this appeal.

As relevant here, the term "insider" is defined in § 101(31)(B) of the Bankruptcy Code:

(31) The term "insider" *includes*—

* * *

(B) if the debtor is a corporation--

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor. . . .[9]

Minnesota's definition of "insider" is nearly identical,[10] and at least one court in Minnesota has used the same analysis under both statutes.[11]

---

[8] Minn. Stat. § 513.45(b).

[9] 11 U.S.C. § 101(31)(b) (emphasis added).

[10] *See* Minn. Stat. § 513.41(8)(ii).

[11] *See, e.g.*, *In re Petters Co., Inc.*, 499 B.R. 342, 365-66 (Bankr. D. Minn. 2013).

The parties agree that Ms. Glasser does not fall within any of the statutorily defined categories of insiders with respect to the Debtor, but the list of insiders in § 101(31) "is illustrative, not exclusive," and so we must look beyond the statutory categories to determine if Ms. Glasser is an insider of the Debtor.[12]

The legislative history emphasizes the closeness of the relationship in making this determination: "[A]n insider is one who has a sufficiently close relationship with the debtor that [her] conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor."[13] The determination of whether a person is a non-statutory insider is fact-intensive, and must be made on a case-by-case basis.[14] Since each case that decides non-statutory insider issues is based on its unique facts, courts have developed any number of tests for that determination.[15] In *In re Rosen Auto*, we described "insider" as follows:

---

[12] *In re Rosen Auto*, 346 B.R. at 804; 11 U.S.C. § 102(3) (the terms "includes" and "including" are not limiting).

[13] H.R. REP. No. 95–595, at 25 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6269; S.R. REP. No. 95–989, at 24 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5810 (*quoted in Matter of Newcomb*, 744 F.2d 621, 625 n.4 (8th Cir. 1984)).

[14] *In re Petters Co.*, 499 B.R. at 365.

[15] *See, e.g.*, *In re Winstar Commc'ns, Inc.*, 554 F.3d 382 (3d Cir. 2009) (holding that a person need not be in "actual control" of the debtor to be an insider); *In re U.S. Medical, Inc.*, 531 F.3d 1272, 1280 (10th Cir. 2008) ("We hold here that a creditor may only be a non-statutory insider of a debtor when the creditor's transaction of business with the debtor is not at arm's length; a bankruptcy court, however, may find a statutory insider without this requirement."); *In re O'Neill*, 550 B.R. at 516-17 (using a multi-element test in the context of a former spouse); *In re Petters Co.*, 499 B.R. at 366 ("a closeness of relationship alone is not sufficient to establish insider status for the avoidance of a particular transfer. There must also be something anomalous, beyond arms-length, about the transaction that featured the transfer."); *Bruno Mach. Corp. v. Troy Die*

An insider is one who does not deal at arm's length with the debtor. Involvement in the day-to-day business of a debtor may elevate a creditor to insider status. However, the creditor would have to exert control over the debtor before gaining insider status. The ability of a creditor to compel payment of a debt is insufficient control to render the creditor an insider. In ascertaining insider status, the closeness of the relationship between the parties is also relevant.[16]

As some other courts have done,[17] and as this passage would seem to suggest, the Bankruptcy Court here applied essentially a three-part test considering: (1) the closeness between the Ms. Glasser and the Debtor; (2) the degree of control or influence Ms. Glasser had over the Debtor; and (3) whether the transactions between them were conducted at arm's length. Despite the various tests coming from courts attempting to deal with endless variations of possible insiders, "[i]t is important not to allow judicial glosses . . . to supersede the statute itself."[18] Based on the statutory language and legislative history, the ultimate issue is whether the creditor has a

---

*Cutting Co., LLC* (*In re Bruno Mach. Corp.*), 435 B.R. 819 (Bankr. N.D. N.Y. 2010); *In re Oakwood Homes Corp.*, 340 B.R. 510, 523 (Bankr. D. Del. 2006) ("courts have applied insider status 'flexibly to include a broad range of parties who have a close relationship with the debtor'") (citation omitted); *Hirsch v. Tarricone* (*In re Tarricone*), 286 B.R. 256 (Bankr. S.D. N.Y. 2002) (holding that influence by an insider can be assumed, so it is unnecessary to prove actual control if a close relationship has been established).

[16] *In re Rosen Auto*, 346 B.R. at 804 (citing *In re Newcomb*, 744 F.2d 621, 625 n. 4 (8th Cir. 1984)).

[17] *See, e.g., OHC Liquidation Trust v. Credit Suisse First Boston* (*In re Oakwood Homes Corp*.), 340 B.R. 510, 523-24 (Bankr. D. Del. 2006).

[18] *Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 884 (7th Cir. 2013) (in the context of the dischargeability of student loans).

sufficiently close relationship to management to presume that that creditor unfairly received special treatment.

In determining closeness, the degree of control a defendant had over the debtor is certainly relevant. As stated, however, the parties agree that Ms. Glasser was not "in control of the Debtor," and is thereby not a statutory insider. But at some point, if any measure of control were proven, that would be a factor in evaluating the closeness of the relationship with the Debtor.

Here, the Trustee argues that since Ms. Glasser worked in the Debtor's warehouse, she had some control over its operations. But being an employee proves nothing, since there was no evidence that she had anything at all to do with any operational decisions. We agree that the Bankruptcy Court correctly found that the Trustee failed to prove that Ms. Glasser had any measure of control over the Debtor's operations.

As to closeness – the ultimate determination here – the Trustee points to several other aspects of Ms. Glasser's relationship with the Debtor (via Mr. Pomije). First, the Trustee points out that she was his ex-spouse, and that they had three children. But they had been divorced for more than fifteen years at the time of payment, and the three children were grown. Next, the Trustee points out that Ms. Glasser (and her husband) made the loan to the Debtor without receiving its financial records. But, as Ms. Glasser testified, she and her husband made the loan due to her past relationship with Mr. Pomije, because she had confidence based on his past successes. And, the Glassers both testified that they consulted with their accountant and financial manager about the loan.

Next, the Trustee points out that the Glassers got a personal guaranty from Mr. Pomije while other bridge lenders did not. But the loans to the various bridge

lenders all had different terms.  For example, several of the lenders were given warrants (options to purchase stock in the future for a set price), and the right to payment of interest, at various rates, during the first 90 days of the loan.  The Glassers instead opted for a personal guaranty and charged an origination fee rather than interest for the 90-day repayment period.  While the Glassers were given a default interest rate of 20%, slightly higher than some of the others, that is hardly sufficient to prove a less than arm's length negotiation.  The Trustee failed to prove that there was anything untoward about Mr. Glasser's efforts to negotiate the best deal for him and his wife.  The fact that they negotiated slightly different terms proves nothing.

And, finally, the Trustee argues that the fact that Ms. Glasser was repaid means that she was sufficiently close to Mr. Pomije to be treated as an insider.  But that would make an insider of anyone who gets paid within a year prior to bankruptcy.  Ultimately, the Trustee argues that while no one part of their relationship proves sufficient closeness, the various ways in which their lives intersect create a close enough relationship to make Ms. Glasser an insider.  The Court correctly disagreed, holding that the Trustee failed to prove that Ms. Glasser had any measure of control other than as a creditor to whom payment was due, or that she had a sufficiently close relationship with Mr. Pomije to merit insider status.

Up to this point, this appeal seems relatively straightforward.  However, the Bankruptcy Court also found that the original loan from the Glassers to the Debtor was not made at arm's length.  As seen, the evidence was that Mr. Glasser negotiated the terms of the loan, as did five other lenders in the same set of bridge loans.[19]  The bridge lenders all had Mr. Pomije over a barrel – he needed their loans to keep his

_____

[19] Mr. Pomije himself made three bridge loans at this same time as well.

11

business in operation until additional capital could be raised. So, not surprisingly given the risk, each of them negotiated terms that were harsher than the Debtor would have gotten if it had been able to obtain conventional bank financing. Like the other bridge lenders, the Glassers knew they would only be repaid if the Debtor succeeded in raising new capital. The fact that Mr. Glasser only made the loan on terms that were acceptable to him and his wife, given the risk, does not mean that the negotiations were at less than arm's length. And, other than the fact that Mr. Glasser drove a hard bargain, there is no evidence about those negotiations which shows anything other than that he and Mr. Pomije were each acting in their own best interests.

More importantly, the Court did not find that the *repayment* of the loan was at less than arm's length. We think it significant that the PPM expressly stated that $1.3 million of the funds raised would be used to repay bridge loans. Of course, some of the bridge loans were not repaid from the initial capital infusion, but it is also significant that all of the bridge loans which had been made at the same time as the Glassers' and which were *not* paid, had both warrants and lower interest rates. As a result, it made good business sense for the Debtor to repay the Glassers. In sum, the Trustee failed to prove that Ms. Glasser was an insider simply because her husband negotiated the best deal he could get, or because the obligation to her was repaid.

After considering the statute, the legislative history, and after weighing the factors we considered in *Rosen Auto*, the Bankruptcy Court found that Ms. Glasser did not have sufficient closeness to be treated as an insider. Since we agree with this ultimate conclusion, we AFFIRM.

———————————————